1
2
3
4

Patrick H. Dwyer, SBN 137743
P.O. Box 1705
Penn Valley, CA 95946
Tel: (530) 432-5407; Fax: (530) 432-9122
Email: pdwyer@pdwyerlaw.com
Attorney for Plaintiff Aram Mkrtchyan

5
6

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF CALIFORNIA

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Aram Mkrtchyan, an individual,

   Plaintiff

      v.

Sacramento County, California, a

   county government and the operator

   of the Sacramento County Sheriff's

   Department and its Correctional

   Health Services Division; and

   the following persons as individuals

   and in their capacity as officials,

   employees or contractors of

   Sacramento County:

R. Scott Jones;

Grant Nugent;

Deputy Dominguez;

Deputy Yang; Deputy Grout; Deputy

Meier,  and

Does 1 through 40,

   Defendants.

CASE NO.:

COMPLAINT FOR INDIVIDUAL, SUPERVISORY, AND MUNICIPAL VIOLATIONS OF 42 U.S.C. §1983; STATE LAW CLAIMS FOR INTENTIONAL INFLICTION OF PAIN AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, VIOLATIONS OF CALIFORNIA CIVIL CODE §52, AND RESPONDEAT SUPERIOR LIABILITY

25
26
27
28

### I.
### INTRODUCTION

    This is a civil rights action arising out of the deliberate and callous refusal to send Plaintiff Aram Mkrtchyan for required surgery to repair a heel bone fracture

while Plaintiff was an inmate in the Sacramento County jail system.

## II.
## JURISDICTION AND VENUE

1.      Jurisdiction over the federal causes of action under Title 42 U.S.C. §1983 are proper in this Court under 28 U.S.C. §1331.  Pendant Jurisdiction over the state causes of action is proper under Title 28 U.S.C. §1367(a) and Title 28 U.S.C. §1343(a)(3).

2.      Venue is proper in this Court under 28 U.S.C. §1391(b) because all of the defendants reside, and the acts complained of occurred, within the territorial boundaries of this United States District Court.

3.      Intra-district venue is proper in the Sacramento Division of this Court under Local Rule 120(d) because the acts and omissions that are the basis of this complaint occurred within Sacramento County.

## III.
## PARTIES

4.      Plaintiff Aram Mkrtchyan ("Mkrtchyan" pronounced *"M-kirch-ien"*) is a single male, age 33.  Plaintiff Mkrtchyan resides at 10180 Country Way, Sacramento, CA 95827.

5.      Defendant Sacramento County, California, established and operates the Sacramento County Sheriff's Department ("SCSD") which is responsible for the staffing and operation of the Main Jail at 651 I Street, Sacramento, California ("Main Jail") and the Rio Cosumnes Correctional Center in Elk Grove, California ("RCCC Jail").  Plaintiff is informed and believes, and on that basis alleges, that the SCSD provides first response and day to day medical care to the inmates at the RCCC Jail and the Main Jail through its Correctional Health Services Division. The SCSD will employ outside medical contractors on "as-needed" basis.

6.      Defendant R. Scott Jones is the Sheriff and is in command of the SCSD.

7.      Defendant Deputy Dominguez ("Dominguez") was employed by the SCSD and was working as a deputy sheriff at the Sacramento County Main Jail, 651 I Street, Sacramento, at the time of the events alleged below.

8.      Defendant Deputy Yang ("Yang") was employed by the SCSD and was working as a deputy sheriff at the Sacramento County Main Jail, 651 I Street, Sacramento, at the time of the events alleged below.

9.      Defendant Deputy Grout ("Grout") was employed by the SCSD and was working as a deputy sheriff at the Sacramento County Main Jail, 651 I Street, Sacramento, at the time of the events alleged below.

10.     Defendant Deputy Meier ("Meier") was employed by the SCSD and was working as a deputy sheriff at the Sacramento County Main Jail, 651 I Street, Sacramento, at the time of the events alleged below.

11.     Defendant Grant Nugent was employed by the SCSD and was working as the Director of its Correctional Health Services at the time of the events alleged below.

12.     The true names and capacities of defendants sued herein as Does 1-40, inclusive, whether individual, corporate, or otherwise are unknown to Plaintiff who, therefore sues such defendants by such fictitious names. When their true names and capacities are ascertained, Plaintiff will amend this complaint by asserting their true names and capacities herein.  Plaintiff is informed, believes and thereon alleges, that at all times herein mentioned, all defendants, including Does 1 through 30, inclusive: (i) are qualified to do business in California, and/or did, in fact, do business in California; (ii) jointly perpetrated the acts herein with their co-defendants; (iii) were the successors in interest to, or agents, alter egos, principals, co-tenants, partners, joint venturers, or co-conspirators of their co-defendants in doing the things herein alleged; and/or (iv) were acting within the scope of their authority or in furtherance of a common scheme or design with the

3

knowledge, permission, consent or ratification of their co-defendants in doing the things herein alleged, and therefore are liable, jointly and severally, for all damages and other relief or remedies sought by complainants in this action.

## IV.
## BACKGROUND ALLEGATIONS

**Duties of Sacramento County and the Sacramento County Sheriff's Department**

13.     Defendant Sacramento County and the SCSD are obligated to have policies, practices, and procedures to: (a) prevent the unlawful use of force against detainees and inmates; and (b) provide timely and effectively response to the medical needs of inmates ("PPs").

14.     Defendant Sacramento County and the SCSD are obligated to adequately train their deputy sheriffs and other correctional officers: (a) in the lawful use of force with detainees and inmates; and (b) the timely and effectively response to the medical needs of detainees and inmates.

15.     Defendant Sacramento County and the SCSD are obligated to adequately supervise their deputy sheriffs and correctional officers to verify the effectiveness and enforcement of the PPs and training in the: (a) lawful use of force with detainees and inmates; and (b) the timely and effectively response to the medical needs of  detainees and inmates.

16.     Defendant Sacramento County and the SCSD maintain a video surveillance system at the RCCC Jail and the Main Jail  ("VSS").  Plaintiff is informed and believes, and on that basis alleges, that the VSS was installed, in part, to verify that the PPs are being followed, that training has been adequate, and that supervisors are monitoring the conduct of deputies and other correctional officers in the lawful use of force and the provision of timely and effective medical response for all inmates.  Plaintiff is further informed and believes, and on that basis alleges, that the VSS also provides a ready means for the SCSD to investigate inmate complaints

4

about these matters.

17.     Plaintiff is informed and believes, and based thereon alleges, that there is a custom and practice among the deputies in the SCSD, known in the vernacular of police culture as the "blue wall of silence" or "blue code" to keep secret the errors, misconduct, or crimes (including police brutality) of fellow officers.  Under federal and state constitutional and statutory law, Defendant Sacramento County and the SCSD have a duty to break down this "blue wall of silence" among their deputies and correctional officers so that the unlawful use of force is reported to superiors without repercussions to non-offending deputies and correctional officers.

The Failure to Provide Medical Care

18.     On or about July 12, 2016, Plaintiff was booked into Sacramento County Main Jail pending trial and was transferred on or about July 29, 2016, to the RCCC Jail.  Plaintiffs' alleged offenses were non-violent and not serious, so he was assigned to a low security barracks at the RCCC Jail called the K barracks.

19.     On or about 8:00 pm on August 29, 2016, Plaintiff was in the outdoor exercise area attempting to retrieve a handball by climbing part way up the cyclone fence that surrounds the exercise area.  Plaintiff slightly misjudged his landing when he pushed off the fence, back to ground.  He intended to land squarely on both feet, but instead, he landed on the heels of both feet, with somewhat more weight on his right foot.

20.     Plaintiff was on the ground dazed for a minute.  He then began to feel pain in both feet, especially his right foot.  Plaintiff tried to stand, but fell back down.  Plaintiff then stood up again with his weight shifted onto his left foot.  Plaintiff hopped the short distance (3-5 feet) to the door from the exercise yard into the K barracks.  Plaintiff was able to get the door open and

then get back to his bunk that, fortunately, was just inside this doorway to the exercise yard.

21.     The inmates near Plaintiff saw he was hurt and contacted the staff. Plaintiff waited for someone on staff to respond, but no one came.  After waiting about an hour for someone to come, Plaintiff took some ibuprofen that he had purchased from commissary.  No staff member responded that night.

22.     At approximately 4:15 am on or about August 30, 2016, Plaintiff had to use the restroom, but was unable to do so without help.  Plaintiff could not call anyone for help, so Plaintiff hopped back out to the exercise area to urinate.  At approximately 7:00 am, Plaintiff needed to use the restroom urgently, but Plaintiff was unable to contact anyone for help because there were no emergency buttons in the dorm.  Plaintiff had to crawl on his hands and knees to the restroom and then pull himself onto a toilet.  Plaintiff then had to crawl on his hands and knees back to his bunk

23.     At approximately 2:15 pm on or about August 30, 2016, a deputy notified medical personnel of Plaintiff's injuries.  At approximately 5:20pm on or about August 30, 2016, Plaintiff was taken by wheelchair to the Medical Housing Unit at the RCCC Jail ("MHU"). The MHU is a separate building at the RCCC Jail and is a considerable distance from the K Barracks.  The MHU includes a barracks style dorm and is equipped with a nurse's station, wheel chairs, adjustable hospital beds and bunks, and wheelchair accessible showers and toilets.  The MHU is located on what is called the "Honor Farm" portion of the RCCC Jail that only houses sentenced inmates.  Plaintiff is informed and believes, and on that basis alleges, that pre-trial detainees are kept in one of the four single person cells at the MHU on 24 hour lock down basis while sentenced inmates housed are free to move around the MHU

dorm area.  Plaintiff was awaiting trial, so he was placed in one of the single person detention cells and he was kept there for approximately 48 hours.

24.    At approximately 9:00 am on or about August 31, 2016, Plaintiff was seen by an in-house nurse.  Plaintiff's right ankle was severely swollen and discolored, while Plaintiff's left ankle was only moderately swollen and discolored.   Plaintiff is informed and believes, and on that basis alleges, that the nurse spoke by phone with a doctor who ordered that both feet be x-ray imaged.

25.    Plaintiff was then taken by wheelchair to a separate building for x-rays. The technician proceeded to take images of Plaintiff's right ankle, which was very swollen and discolored, but then did not take any images of Plaintiff's left ankle, which was also swollen and discolored, although not as severely. Plaintiff asked the technician why his left foot was not being imaged and the tech said that the doctor didn't order x-rays for the left foot.

26.    At approximately 11:30 pm on or about August 31, 2016, Plaintiff was taken by wheelchair to an exam room at MHU where Plaintiff was examined by a Mike Wolford, a contract orthopedic technician.  Mr. Wolford took photographic (not x-ray) images of Plaintiff's right foot and then put it into a cast.  No pictures were taken of Plaintiff's left foot, although it was bruised and swollen.  Upon completion, Plaintiff was taken back to his cell at MHU.

27.    At approximately 11:00am on September 1, 2016, Plaintiff was visited in his cell at the MHU by a male in-house physician to discuss the injuries shown by the x-rays.  This doctor told Plaintiff that there was a calcaneal fracture in the right foot and ordered Plaintiff to not bear any weight on his right heel.  The doctor further warned Plaintiff of serious adverse consequences from not following his order because it would further shatter

the calcaneal bone.   Plaintiff told this doctor that his left foot was not x-rayed as was first prescribed.  The doctor said this was due to a mis-communication and he would reschedule the x-ray of Plaintiff's left foot as soon as possible. However, no x-ray of the left foot was ever taken while Plaintiff was at the RCCC Jail.

28.    At approximately 2:00pm on September 1, 2016, Plaintiff was told by a deputy that he would be moved back to the K barracks.  Plaintiff was then taken in a wheelchair to K barracks, but the wheelchair was taken away by deputies and Plaintiff was left with the crutches he received from the nurses at the MHU.  Without a wheelchair, Plaintiff had to remain in his bunk, except for visits to the bathroom which were difficult, painful, and dangerous because they had to be made with the crutches and there were no features for disabled inmates.

29.    At approximately 9:00 am on September 2, 2016, a deputy came to escort Plaintiff to an orthopedic surgeon appointment.  However, the deputy did not have a wheelchair.  Plaintiff explained to the deputy that: (a) it was extremely painful for him to crutch on his left foot because it had also been injured in the accident; and (b) the doctor had warned Plaintiff not to put even the slightest weight on his right foot.  The deputy said "I don't have a wheelchair, you can refuse the appointment by signing a refusal form." Plaintiff had no choice but to use crutches for the long walk to an exam room adjacent to the kitchen at the RCCC Jail. [This exam room was even further away than the MHU building.]  Plaintiff had to stop and rest approximately five times on the way to the appointment because of the severe pain.  The deputy, however, was completely insensitive and even contemptuous of Plaintiff.

30.     At the medical appointment on September 2, 2016, an orthopedic surgeon consulted with Plaintiff about the injury to his right foot. The surgeon said that it was an "Intra-Articular Displaced Calcaneal Fracture" and required immediate surgery.  The surgeon made it clear that the surgery had to be performed within 7 to 10 days.   Plaintiff was told that a CT scan was also needed and that patients, such as Plaintiff, with a severe calcaneal fracture may have additional injuries and a thorough evaluation of the spine should be performed.  Plaintiff was also told that an x-ray of left foot must be done. Plaintiff was further warned that if the left foot had a hairline fracture and Plaintiff put all his weight on it, this could also result in additional severe damage. The surgeon stressed the importance of elevating Plaintiff's feet as much as circumstances allow.  The surgeon strongly emphasized that the right foot must not have any weight bearing and that the left foot also should not bear weight until x-ray images and further examination.  Despite the orthopedic surgeons express orders, Plaintiff was forced to return to the K barracks on crutches.

31.     Approximately twenty minutes after Plaintiff's arrival back at his K barracks bunk, Plaintiff heard an intercom announcement for him to "roll up" his things because he would be moving.  A deputy came with a wheelchair to transport him to another location at the RCCC jail called the "JKF".  Plaintiff is informed and believes, and on that basis alleges, that in contrast to the K barracks which are for low security inmates, the JKF is a medium security area at the RCCC Jail that is nicknamed the "thunder dorm" due to its reputation of frequent inmate fights.  Plaintiff had never had a disciplinary write-up and he was not told why he was being placed there.

32.     Plaintiff, being seriously injured and defenseless, was terrified at being

9

placed at the JKF unit because it is a two-tiered pod that consists of approximately  50 double bunks on each tier, with about three feet between the double bunks.  Upon arrival, Plaintiff crutched over to the bathroom to see if it had appropriate safety features for disabled persons, such as a bench to sit on while showering and hand rails for the toilets: there was neither. Obviously, Plaintiff was going to have an extremely hard time maneuvering on crutches and getting in/out of a bunk.

33.     Plaintiff was so upset and fearful that he had a severe anxiety attack that felt like he was having a heart attack.  Plaintiff pushed the emergency button in the JKF dayroom and he was escorted on his crutches to a small exam room adjacent to the JKF pod.  Plaintiff pleaded with the nurse to not send him back to the JKF pod.  When she indicated that it was not her decision, Plaintiff refused to go back to JKF pod.

34.     Plaintiff was escorted on his crutches by a deputy and put in a holding tank at the JKF pending resolution.  About a half hour later, three male sergeants came to talk to Plaintiff.  Plaintiff estimates that they were about 45 to 50 years old.  After some discussion, these sergeants told Plaintiff that he could not be housed in the regular dorm area at the MHU (which has wheelchair accessible showers and toilets for disabled persons) because Plaintiff was not a convicted inmate, just a pre-trial inmate.  They also did not say why Plaintiff could not stay in one of the four cells at the MHU for pre-trial inmates.  In addition, these sergeants told Plaintiff that wheelchairs were not issued to inmates and were only used for a "man down" situation. These sergeants then told Plaintiff that if he promised not to request a wheelchair in the future, he would be allowed to go back to the K Barracks on his crutches.  Plaintiff told them that it was cruel and dangerous to deny him

a proper facility and to make him use crutches.  The sergeants became angry with Plaintiff.  They handcuffed him, pushed him into a wheelchair, and took him to administrative segregation in the SBF maximum security facility at the RCCC Jail.

35.    Plaintiff was housed in the administrative segregation cell for the next four days.  Plaintiff was denied his crutches for two days and he had no access to a shower that was disability equipped or a toilet that had disability handles.

36.    Early morning on the morning of September 6, 2016, Plaintiff was notified that he would be going back to the Main Jail.  A deputy came with a wheelchair to take Plaintiff from his cell to where Plaintiff was to wait for a bus.  Plaintiff was placed into an inmate-attorney visitation room that was approximately three feet square.  It was an almost impossible place for Plaintiff in his condition.  After about 45 to 60 minutes in this room, Plaintiff knocked on the door to get a deputy's attention and tell them he can't stay in this little room with his injuries and crutches.  A deputy came and told Plaintiff to stop banging on the door.  Finally, Plaintiff was taken outside, using his crutches, to the actual bus loading area.  Plaintiff was the last person allowed to board.  Plaintiff was taken to the rear door and told to place his crutches inside and then crawl and drag himself up the stairs into the bus.  No deputy would help him.  When Plaintiff got onto the floor of the bus, he then had to lift himself onto a bench style seat.

37.    Upon arrival at the Main Jail at approximately 7:00 am, two deputies, one on each arm, lifted Plaintiff down off the bus and gave Plaintiff his crutches.  Plaintiff was escorted to the entrance and upon entering the jail, he was approached by Deputy Dominguez.  The first thing Deputy Dominguez

said to Plaintiff was: "you're the jihadist I've been hearing about giving my partners a hard time at RCCC".   Plaintiff was stunned: he is an American citizen of Armenian ancestry and not a muslim.  Plaintiff responded: "I'm suffering, coward, have some sympathy".  Deputy Dominguez then grabbed Plaintiff's crutches and made Plaintiff hop to an attorney-client no-contact interview room and get inside.  The room was about three by three feet and Plaintiff sat on a small stone chair unable to put his legs in a safe or comfortable position.  After about 45 minutes, Plaintiff knocked on the door to be allowed to go use the bathroom.  No one would respond and Plaintiff had to relieve himself on the floor of the small room. Nearly one hour later, Deputy Dominguez opened the door, noticed the urine on the floor, and called Plaintiff a "rag head pussy" and closed the door and left.  After approximately another hour, Dominguez let Plaintiff out and escorted him on his crutches to a holding tank with a toilet.  Dominguez took Plaintiff's crutches.

38.     Plaintiff had another serious panic attack with chest pain.  Plaintiff hit the emergency button and a female deputy responded over the intercom.  Plaintiff told her that he was having serious chest pain.  Plaintiff crawled back to the bench, waited for a short time and crawled back to activate the button again.  Again the female deputy responds on the intercom and Plaintiff states his medical emergency. Plaintiff then crawls back near the bench, but is unable to lift himself and remains on the floor.  Deputy Dominguez approaches the holding tank door and tells Plaintiff to "stop hitting the medical button, you making me look bad" and threatens Plaintiff with repercussions if he does not stop. After about 20 minutes, Plaintiff's chest still had serious pain and he again activated the medical emergency button.  The same female deputy responded on the intercom and  Plaintiff

again asks for urgent care.

39.    At approximately 9:10 am, two nurses responded and examined Plaintiff.  These nurses requested that Plaintiff be immediately taken to 2 East Medical for an EKG.  This was at about 10:00 am.  However, Plaintiff was not taken for an EKG until approximately 4:30pm.  Plaintiff is informed and believes, and on that basis alleges, that it was Deputy Dominguez that prevented the nurses from responding to Plaintiff sooner and that he then delayed Plaintiff being taken to the medical unit for an EKG for many hours.

40.    At approximately 7 p.m. on September 10, 2016, Plaintiff was attempting to move about in his cell at the Main Jail medical pod when one of the crutches he had been issued at RCCC Jail broke. [Plaintiff is informed and believes, and on that basis alleges, that the crutches he had been issued were used and made from miscellaneous crutch parts.] Plaintiff lost his balance and fell in his cell.  Plaintiff used the emergency button to summon a nurse.  The nurses examined Plaintiff's crutches, took them away and finally issued Plaintiff a wheelchair.  While the nurse was exchanging the broken crutches for the wheelchair, Plaintiff again asked about having his left foot examined, including x-ray imaging.  The nurses said this had been scheduled for the next few days.

41.    On or about September 12, 2016, Plaintiff finally had his left foot examined, including x-rays.  The images revealed that Plaintiff had severely bruised his left heel at the same time as his right heel.

42.    Between September 1, 2016 and October 10, 2016, Plaintiff had repeatedly asked when he was going to be sent out for surgery on his right foot as ordered by the orthopedic surgeon (see paragraph 30).  Plaintiff just kept being told that it was about to happen, but it never did.  Consequently,

on or about October 10, 2016, Plaintiff prepared and submitted a grievance form that was signed for by Deputy Ross.

43.     The next morning, Plaintiff was taken to San Joaquin County Hospital. There he was told by the orthopedic surgeon at the hospital that it is too late for the surgery that should have been done within the first week.  Instead, Plaintiff was told that he would now require multiple surgeries and that his heel bone would never heal correctly, leaving Plaintiff with a disability.

44.     On or about February 2, 2017, a Deputy Campbell came to Plaintiff's cell (2 East 105) as part of his regular routine inmate check.  Deputy Campbell stopped and told Plaintiff that "you are starting to make too much noise upstairs and from past experience I can tell you that when you start going against the department and the county, they will eventually push back".  Deputy Campbell did not say this to Plaintiff in a threatening manner, but to inform Plaintiff that, because of the grievances Plaintiff had been filing, as well as Plaintiff's tort claim (see paragraph 49), Plaintiff was being discussed in a hostile manner by more senior jail officers.

45.     On or about February 2, 2017, Plaintiff was taken to an appointment with a Dr. Neblet at the Main Jail.  Plaintiff explained that he had been ordered to have surgery on his right foot within seven days of the original injury, but that Plaintiff had never been scheduled for this crucial surgery. Dr. Neblet agreed with the original diagnosis and order for immediate surgery.  Dr. Neblet observed that Plaintiff's right foot was still swollen, painful, limited in range of motion, and that the heel bone had partially healed, but incorrectly due to the failure to have timely surgery.  Dr. Neblet also noted that Plaintiff was experiencing typical side effects, such as back pain.  Dr. Neblet agreed that Plaintiff should have been using a wheelchair

and a walker, not crutches.  Further, Dr. Neblet agreed that Plaintiff should continue to be housed in the MHU at the Main Jail.

46.     At approximately 10:00 am on February 2, 2017, deputies came to Plaintiff's cell at the MHU and took Plaintiff's wheelchair, gave Plaintiff a cane, and told Plaintiff to pack his things because he was being moved upstairs.  Plaintiff had no choice but to comply.

47.     At approximately 2:30 am on February 6, 2017, Plaintiff arrived on the 6th floor of the Main Jail with a lower tier, lower bunk clearance.  Plaintiff was met by a Deputy Yang who had a deputy trainee with him.  While waiting to go to the new bunk, Deputy Yang remarked "Do something about the beard dope fiend or you won't get blankets".  Plaintiff asked what he meant by that and Deputy Yang said "I got clippers in here go in the class room and cut it".   Plaintiff remained silent and did not take the clipper. Plaintiff was then told to go to 100 pod cell 19.  Plaintiff objected because this was a top tier cell and he was cleared for a lower tier cell.  Deputy Yang replied "dope fiend, you go or we'll take you and don't grab blankets". Plaintiff complied and had to drag his bag of belongings behind him (about 80 lbs.) while using only a cane.

48.     When Plaintiff entered the pod for his new cell, Plaintiff observed that the AC in the cell was blowing full blast and it was cold.  Plaintiff had just been denied blankets because he refused to shave his beard.  Plaintiff was able to wait about 45 minutes before he had to hit the emergency button in the cell.  When the deputy answered the bell, Plaintiff begged for some blankets, but the deputy responded "we don't have blankets on the floor". Plaintiff tried again a couple of times and the second time Plaintiff said he would shave his beard in exchange for blankets.  Deputy Yang replied "it's too

1   late, the offer is off the table".  The next morning, a fellow inmate brought
2   Plaintiff blankets.

3   49.    At approximately 2:40 pm on February 8, 2017, the deputy on shift
4   came on the microphone in Plaintiff's cell and told him to come to the control
5   booth on the lower tier.  As Plaintiff was trying to go down the stairs from the
6   top tier, he lost his balance and rolled down the stairs.  Deputy Meier and
7   nurses arrived with a wheelchair.  They picked Plaintiff up and took him by
8   wheelchair to the MHU.  Plaintiff was examined by a Dr. Henderson who
9   concluded that Plaintiff had a swollen right foot (i.e., had re-injured his right
10  ankle), but was otherwise ok and Plaintiff was cleared back to his cell.
11  Plaintiff asked Dr. Henderson to order that Plaintiff be put in more accessible
12  housing, Dr. Henderson refused.

13  50.    A Deputy Meier, who was familiar with Plaintiff's injuries, refused to
14  give Plaintiff a wheelchair ride over to the elevator that would take Plaintiff
15  back up to the top tier.   Plaintiff got up from the wheelchair and then hopped
16  on his left foot for about 10 feet, but that was so painful that Plaintiff then
17  crawled for another 20 feet and got on the elevator.  When Plaintiff got back
18  upstairs (the 6th floor), he asked the deputy to house him in a lower tier
19  lower bunk.  Deputy Grout told Plaintiff to go back to the bunk he had been
20  assigned.  Plaintiff explained how he had just fallen down the stairs, but
21  Deputy Grout told Plaintiff to "stop fabricating problems that you don't have".
22  Plaintiff did his best to go back up the stairs, but he could not.

23  51.    On or about February 8, 2017, Plaintiff was finally re-assigned to a
24  lower tier in the Main Jail.  However, Plaintiff was still not given a wheel
25  chair and he had to use a cane until the date of his release on or about April
26  23, 2017.

27

28                                        16

52.  At all relevant times to the foregoing factual allegations, Plaintiff repeatedly told every deputy in charge of the areas in which he was housed that he was in need of: (a) surgery for his foot; (b) a wheelchair; (c) access to bath and toilet facilities that were suitably equipped for the handicapped; and (d) housing on the ground floor with a lower bunk assignment.

53.  On or about February 2, 2017, Plaintiff filed a grievance with the jail authorities about his mis-treatment, inability to shower, and the lack of any ADA compliant showers and bathroom facilities.  The grievance was denied on or about April 5, 2017.  A true and correct copy of the grievance and denial is attached as Exhibit 1.

54.  On or about January 31, 2017, Plaintiff completed a tort claim form and sent the completed form to the Clerk of the Board of Supervisors for Sacramento County.  The claim was apparently received by the Board of Supervisors on or about February 14, 2017.  The claim was denied by Sacramento County on or about March 30, 2017, through the inaction of the Board within 45 days of the filing of the claim.   A true and correct copy of Plaintiff's tort claim and written denial thereof is attached as Exhibit 2.

### V.
### Claims For Violation of Federal Civil Rights Under 42 U.S.C. §1983
### FIRST CAUSE OF ACTION
### Defendant Sacramento County
### Municipal Liability for Violation of Plaintiff's Constitutional Rights
### (Deliberate and Callous Disregard for Inmate Medical Problems)

55.     Plaintiff hereby incorporates by reference paragraphs 1 through 53, inclusive, as though set forth fully herein.

56.     Sacramento County has failed to adequately establish policies and procedures ("PPs') regarding the timely and effective provision of medical services for inmates that are adequate for protecting the right of inmates to medical care.

57.     Sacramento County has failed to adequately train its personnel regarding the timely and effective provision of medical care for inmates.

58.     Sacramento County has failed to adequately monitor or enforce policies and procedures for the timely and effective provision of medical care for inmates.

59.     Sacramento County has failed to adequately supervise its personnel regarding the timely and effective provision of medical care for inmates.

60.     While Sacramento County may have PPs regarding the timely and effective provision of medical care for inmates, Sacramento County has a *de facto* practice of not providing timely and effective medical care for inmates to minimize the cost of inmate medical care.

61.     It was known and/or obvious to Sacramento County that the acts and omissions described in paragraphs 56-60 would be likely to cause serious violation of the constitutional rights of inmates to timely and effective medical care.

62.     The acts and omissions in paragraphs 56-60 were done under the color of state law and they were the direct and proximate cause of the violation of the constitutional rights of Plaintiff.  These acts and omissions continued for at least a

18

year prior to the institution of this action and Plaintiff is informed and beleives, and on that basis alleges, that these acts and omissions continue until the present time. As a consequence, Sacramento County's acts and omissions in paragraphs 56-60 constitute deliberate indifference to, and a callous disregard for, the constitutional rights of inmates in Sacramento County jails.

63.     As a direct and proximate result of the wrongful acts and omissions of Sacramento County as set forth above, Plaintiff has sustained general damages of an estimated $3,000,000, according to proof, including, but not limited to: (a) the serious physical pain and suffering from the daily repeated injury to his body; (b) the severe emotional and mental distress caused by the daily infliction of physical and psychological pain, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment; (d) the cost of emotional and psychological therapy; and (e) the loss of future economic damages to permanent physical disability.

64.     As a direct and proximate result of the foregoing conduct of Sacramento County, Plaintiff has been forced to file this action under 42 U.S.C. §1983, and is entitled to recover his attorneys fees and costs under 42 U.S.C. §1988.

## SECOND CAUSE OF ACTION

### Defendants Dominguez, Yang, Meier, Grout and Does 1 through 10
### Individual Liability for Violation of Plaintiff's Constitutional Rights
### (Deliberate and Callous Disregard for Plaintiff's Known Medical Problem)

61.     Plaintiff hereby incorporates by reference paragraphs 1 through 53, inclusive, as though set forth fully herein.

62.     Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 were aware of Plaintiff's medical problem and his need for: (a) timely surgery for Plaintiff's calcaneal bone (right foot); (b) the use of a wheelchair and other means to

1   allow Plaintiff not to bear weight on his feet until they had healed; (c) shower and

2   bathroom facilities designed for handicapped persons; and (d) housing on the

3   ground floor with a lower bunk assignment.  However, these defendants

4   deliberately and callously disregarded Plaintiff's medical needs, thereby denying

5   Plaintiff his constitutional right to timely and effective medical care.

6   63.    The foregoing acts and omissions were violations of Plaintiff's substantive

7   due process right to be free of punishment prior to adjudication of the charges

8   pending against Plaintiff under the Fourteenth Amendment of the U.S.

9   Constitution and/or the prohibition of cruel and unusual punishment under the

10  Eight Amendment to the U.S. Constitution.

11  64.    The foregoing acts and omissions of Defendants Dominguez, Yang, Meier,

12  Grout, and Does 1 through 10 were done under the color of state law and were the

13  direct and proximate cause of the violation of the constitutional rights of Plaintiff.

14  65.    As a direct and proximate result of the foregoing conduct of Defendants

15  Dominguez, Yang, Meier, Grout, and Does 1 through 10 as set forth above, Plaintiff

16  has sustained general damages of an estimated $3,000,000, according to proof,

17  including, but not limited to: (a) the serious physical pain and suffering from the

18  daily repeated injury to his body; (b) the severe emotional and mental distress

19  caused by the daily infliction of physical and psychological pain, including feelings

20  of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and

21  pride; (c) the cost of medical treatment; (d) the cost of emotional and psychological

22  therapy; and (e) the loss of future economic damages to permanent physical

23  disability..

24  66.    As a direct and proximate result of the foregoing conduct of Defendants

25  Dominguez, Yang, Meier, Grout, and Does 1 through 10, Plaintiff has been forced to

26  file this action under 42 U.S.C. §1983, and is entitled to recover his attorneys fees

27

28                                       20

1   and costs under 42 U.S.C. §1988.

2   67.   The foregoing acts and omissions of Defendants Dominguez, Yang, Meier,

3   Grout, and Does 1 through 10 were committed with unbridled malice that was

4   despicable and done with full knowledge of the physical and mental pain and

5   suffering to Plaintiff.  As a result, punitive damages should be awarded against

6   Defendants Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10.

### THIRD CAUSE OF ACTION

**Defendants Dominguez, Yang, Meier, Grout and Does 11 through 20**

**Individual Liability for Violation of Plaintiff's Constitutional Rights**

**(Intentional Infliction of Physical and Emotional Pain )**

68.   Plaintiff hereby incorporates by reference paragraphs 1 through 53, inclusive, as though set forth fully herein.

69.   Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 knowingly and intentionally ignored Plaintiff's serious physical disability and pain and as described above: (a) denied Plaintiff the use of a wheelchair; (b) forced Plaintiff to walk excessive distances on crutches or with a cane; (c) forced Plaintiff to crawl on the ground; (d) denied Plaintiff the use of shower and bathroom facilities for handicapped persons; (e) denied Plaintiff a bunk in a medical unit; (f) denied Plaintiff a bunk on a ground floor; and (g) denied Plaintiff a bunk on the lower tier of a double bunk.  The foregoing conduct was extreme and outrageous and was calculated to cause Plaintiff severe emotional distress or was done with substantial certainty that Plaintiff would suffer severe emotional injury.

70.   As the direct result of the foregoing of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10, Plaintiff suffered severe emotional and psychological damage.

71.   The foregoing acts and omissions of Defendants Dominguez, Yang, Meier,

Grout, and Does 1 through 10, were violations of Plaintiff's substantive due process right to be free of punishment prior to adjudication of the charges pending against Plaintiff under the Fourteenth Amendment of the U.S. Constitution and/or the prohibition of cruel and unusual punishment under the Eight Amendment to the U.S. Constitution.

72.    The foregoing acts and omissions of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 were done under the color of state law and were the direct and proximate cause of the violation of the constitutional rights of Plaintiff.

73.    As a direct and proximate result of the foregoing conduct of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 as set forth above, Plaintiff has sustained general damages of an estimated $3,000,000, according to proof, including, but not limited to: (a) the serious physical pain and suffering from the daily repeated injury to his body; (b) the severe emotional and mental distress caused by the daily infliction of physical and psychological pain, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment; (d) the cost of emotional and psychological therapy; and (e) the loss of future economic damages to permanent physical disability..

74.    As a direct and proximate result of the foregoing conduct of Defendants Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 , Plaintiff has been forced to file this action under 42 U.S.C. §1983, and is entitled to recover his attorneys fees and costs under 42 U.S.C. §1988.

75.    The foregoing acts and omissions of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 were committed with unbridled malice that was despicable and done with full knowledge of the physical and mental pain and suffering to Plaintiff.  As a result, punitive damages should be awarded against

1    Defendants Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10.

2                        FOURTH CAUSE OF ACTION

3                R. Scott Jones, Grant Nugent, and  Does 11-20

4    Supervisory Liability for Violation of Plaintiff's Constitutional Rights
                     Under 42 U.S.C . §1983
5         (Deliberate and Callous Disregard for Inmate Medical Needs)

6    76.    Plaintiff hereby incorporates by reference paragraphs 1 through 53, inclusive,

7    as though set forth fully herein.

8    77.    R. Scott Jones, Grant Nugent and Does 11-20 are supervisors of the SCSD,

9    its Correctional Health Services Division, the RCCC Jail, and/or the Main Jail and

10   are responsible, directly or indirectly, in whole or in part, for the provision of

11   medical care to inmates at the RCCC Jail and the Main Jail.  R. Scott Jones, Grant

12   Nugent, and Does 11-20 either: (a) knew that there were inadequate PPs regarding

13   the timely and effective provision of medical care to inmates; (b) knew that there

14   was inadequate training, supervision, or control of subordinates responsible for

15   providing timely and effective medical care to inmates; (c) had a reckless or callous

16   indifference to the right of inmates to timely and effective medical care; and/or (d)

17   acquiesced in the conduct of Defendants Dominguez, Yang, Meier, Grout and Does 1

18   through 10 as alleged in paragraphs 62 and 69.

19   78.    The foregoing acts and omissions of R. Scott Jones, Grant Nugent, and Does

20   11-20 were done under the color of state law that were the direct and proximate

21   cause of the violation of the constitutional rights of Plaintiff.

22   79.    As a direct and proximate result of the wrongful conduct of R. Scott Jones,

23   Grant Nugent, and Does 11-20 as set forth above, Plaintiff has sustained general

24   damages of an estimated $3,000,000, according to proof, including, but not limited

25   to: (a) the serious physical pain and suffering from the daily repeated injury to his

26   body; (b) the severe emotional and mental distress caused by the daily infliction of

27

28                                         23

physical and psychological pain, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment; (d) the cost of emotional and psychological therapy; and (e) the loss of future economic damages to permanent physical disability.

80.    As a direct and proximate result of the foregoing conduct of R. Scott Jones, Grant Nugent, and Does 11-20, Plaintiff has been forced to file this action under 42 U.S.C. §1983, and is entitled to recover his attorneys fees and costs under 42 U.S.C. §1988.

81.    The foregoing acts and omissions of R. Scott Jones, Grant Nugent, and Does 11 through 20 were committed with unbridled malice that was despicable and done with full knowledge of the physical and mental pain and suffering to Plaintiff. Accordingly, punitive damages should be awarded against R. Scott Jones, Grant Nugent, and Does 11 through 20.

# VI.
## STATE LAW CLAIMS

### FIFTH CAUSE OF ACTION

#### Defendants Dominguez, Yang, Meier, Grout, and Does 1-10

#### Intentional Infliction of Emotional Distress

82.     Plaintiff hereby incorporates by reference paragraphs 1 through 54, inclusive, as though set forth fully herein.

83.     The acts and omissions of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 described in paragraphs 15-48 was extreme and outrageous conduct directed at Plaintiff that was calculated to cause Plaintiff severe emotional distress or was done with substantial certainty that Plaintiff would suffer severe emotional injury.

84.     As the direct result of the foregoing acts and omissions of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10, Plaintiff suffered severe emotional and psychological damage.

85.     As a direct and proximate result of the foregoing acts and omissions of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10, Plaintiff has sustained general damages of an estimated $3,000,000, according to proof, including, but not limited to: (a) the serious physical pain and suffering from the injuries to his body; (b) severe emotional and mental distress, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment; and (d) the cost of emotional and psychological therapy.

86.     The foregoing acts and omissions of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 were committed with unbridled malice that was despicable and done with intentional disregard for the emotional and psychological

25

pain, suffering, and trauma it would cause Plaintiff.  As a result, punitive damages should be awarded against Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10.

## SIXTH CAUSE OF ACTION

### Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10
### Negligence

87.     Plaintiff hereby incorporates by reference paragraphs 1 through 54, inclusive, as though set forth fully herein.

88.     Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 each held positions of authority and dominion over Plaintiff that determined whether Plaintiff received timely and effectively medical care.  As a consequence, Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 had a duty to exercise their authority and dominion over Plaintiff in a reasonable manner.

89.     Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 breached the foregoing duty by the acts and omissions described in paragraphs 15-48.

90.     As the direct result of the breach by Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 of their duty to Plaintiff, Plaintiff suffered serious physical and mental injury.

91.     As a direct and proximate result of the foregoing acts and omission of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10, Plaintiff has sustained general damages of an estimated $3,000,000, according to proof, including, but not limited to: (a) the serious physical pain and suffering from the injuries to his body; (b) the severe emotional and mental distress, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment; and (d) the cost of emotional and psychological therapy.

## SEVENTH CAUSE OF ACTION

### Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10

### Interference With Plaintiff's Constitutional Rights
#### Under California Civil Code 52.1(b)

92.    Plaintiff hereby incorporates by reference paragraphs 1 through 54, inclusive, as though set forth fully herein.

93.    Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 committed acts and omissions that constituted threats, intimidation, and coercion directed at Plaintiff in violation of : (a) Plaintiffs right to seek redress of his grievances under the US and California Constitutions; (b) Plaintiff's substantive due process right to be free of punishment prior to adjudication of the charges for which Plaintiff was to appear under the US Constitution; (c) Plaintiff's rights under Article 1, Section 7 & 17 of the California Constitution; and (d) Plaintiff's right to timely and effective medical care.

94.    As a direct and proximate result of the foregoing acts and omission of Defendants Dominguez, Yang, Meier, Grout, and Does 11 through 20, Plaintiff has sustained general damages of an estimated $3,000,000, according to proof, including, but not limited to: (a) the serious physical pain and suffering; (b) the severe emotional and mental distress, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment; and (d) the cost of emotional and psychological therapy.

95.    Pursuant to California Civil Code §52(a) and §52.1(b), Plaintiff is entitled to treble the amount of consequential damages that are proven.

96.    As the direct and proximate result of the foregoing conduct of Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10, Plaintiff is entitled to recover his costs and attorneys fees under Civil Code § 52(b) and § 52.1(h).

1

2

3

## EIGHTH CAUSE OF ACTION

**Defendants Nugent, Dominguez, Yang, Meier, Grout, and Does 1 through 10**

**(Failure to Provide Medical Care Under GC §845.6)**

4

5

97.     Plaintiff hereby incorporates by reference paragraphs 1 through 54, inclusive, as though set forth fully herein.

6

7

8

98.     Defendants Nugent Dominguez, Yang, Meier, Grout, and Does 1 through 10 were public employees that had responsibility to provide medical care to inmates under Government Code §845.6.

9

10

11

99.     Defendants Nugent, Dominguez, Yang, Meier, Grout, and Does 1 through 10 failed to take reasonable action to provide Plaintiff with medical care.  As the direct result of this failure, Plaintiff suffered serious physical and mental injury.

12

13

14

15

16

17

18

19

100.     As a direct and proximate result of the foregoing acts and omissions of Defendants Nugent, Dominguez, Yang, Meier, Grout, and Does 1 through 10, Plaintiff has sustained general damages of an estimated $3,000,000, according to proof, including, but not limited to: (a) the serious physical pain and suffering from the injuries to his body; (b) the severe emotional and mental distress, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment; and (d) the cost of emotional and psychological therapy.

20

21

22

23

## NINTH CAUSE OF ACTION

**R. Scott Jones, Grant Nugent, and  Does 11-20**

**Supervisory Liability**

24

25

101.     Plaintiff hereby incorporates by reference paragraphs 1 through 54, inclusive, as though set forth fully herein.

26

27

102.     R. Scott Jones, Grant Nugent, and Does 11-20 are supervisors of the SCSD, its Correctional Health Services Division, the RCCC Jail, and/or the Main Jail and

28

are responsible, directly or indirectly, in whole or in part, for the provision of medical care to inmates at the RCCC Jail and the Main Jail. R. Scott Jones, Grant Nugent, and Does 11-20 either: (a) knew that there were inadequate PPs regarding the timely and effective provision of medical care to inmates; (b) knew that there was inadequate training, supervision, or control of subordinates responsible for providing timely and effective medical care to inmates; (c) had a reckless or callous indifference to the right of inmates to timely and effective medical care; and/or (d) acquiesced in the conduct of Defendants Dominguez, Yang, Meier, Grout and Does 1 through 10 as alleged in paragraphs 13 through 53.

103.    As a direct and proximate result of the foregoing acts and omissions of R. Scott Jones, Grant Nugent, and Does 11-20 as set forth above, Plaintiff has sustained general damages of an estimated $3,000,000, according to proof, including, but not limited to: (a) the serious physical pain and suffering from the daily repeated injury to his body; (b) the severe emotional and mental distress caused by the daily infliction of physical and psychological pain, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment; (d) the cost of emotional and psychological therapy; and (e) the loss of future economic damages to permanent physical disability.

104.    The foregoing acts and omissions of R. Scott Jones, Grant Nugent, and Does 11 through 20 were committed with unbridled malice that was despicable and done with full knowledge of the physical and mental pain and suffering to Plaintiff. Accordingly, punitive damages should be awarded against R. Scott Jones, Grant Nugent, and Does 11 through 20.

## TENTH CAUSE OF ACTION

### Defendant Sacramento County

### Respondeat Superior Liability Under California Government Code §815.2(a) And/Or 815.6

105.    Plaintiff hereby incorporates by reference paragraphs 1 through 54, inclusive, as though set forth fully herein.

106.    Defendant Sacramento County, which operates the SCSD and the Correctional Health Services Division and is the employer of Defendants Dominguez, Yang, Meier, Grout, and Does 1-10, has full authority to train, supervise, and direct all of the actions of each of these defendants.  Defendants Dominguez, Yang, Meier, Grout, and Does 1 through 10 in their official capacities and in the performance of their duties engaged in the acts and omissions alleged in paragraphs 15-48.

107.    Under California Government Code §815.2(a), Sacramento is liable for any injury that is proximately caused by the act or omission of its personnel within the scope of their duties, including all of the acts and omissions alleged in the Fifth through Ninth Causes of Action.

108.    As a direct and proximate result of the wrongful acts and omissions of omissions of Defendants Dominguez, Yang, Meier, Grout, R. Scott Jones, Grant Nugent, and Does 1 through 20,  for which Defendant Sacramento County is liable under the doctrine of *respondeat superior* and/or California Government Code §815.6,Plaintiff has sustained general damages of an estimated $3,000,000, according to proof, including, but not limited to: (a) the serious physical pain and suffering; (b) the severe emotional and mental distress, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment; and (d) the cost of emotional and psychological therapy.

# ELEVENTH CAUSE OF ACTION

## Defendant Sacramento County

**Liability for Failure to Have Adequate Policies & Practices, Training, Supervision, or Enforcement of Timely and Effective Medical Care for Inmates**

109.    Plaintiff hereby incorporates by reference paragraphs 1 through 54, inclusive, as though set forth fully herein.

110.    Sacramento County has failed to adequately establish policies and procedures ("PPs") regarding the timely and effective provision of medical services for inmates that are adequate for protecting the right of inmates to medical care.

111.    Sacramento County has failed to adequately train its personnel regarding the timely and effective provision of medical care for inmates.

112.    Sacramento County has failed to adequately monitor or enforce policies and procedures for the timely and effective provision of medical care for inmates.

113.    Sacramento County has failed to adequately supervise its personnel regarding the timely and effective provision of medical care for inmates.

114.    While Sacramento County may have PPs regarding the timely and effective provision of medical care for inmates, Sacramento County has a *de facto* practice of not providing timely and effective medical care for inmates to minimize the cost of inmate medical care.

115.    It was known and/or obvious to Sacramento County that the acts and omissions described in paragraphs 110-114 would be likely to cause serious violation of the rights of inmates to timely and effective medical care.

116.    The acts and omissions in paragraphs 110-114 continued for at least a year prior to the institution of this action and Plaintiff is informed and believes, and on that basis alleges, that these acts and omissions continue until the present time.  As a consequence, Sacramento County's acts and omissions in paragraphs 110-114 constitute deliberate indifference to, and a callous disregard for, the constitutional

1  rights of inmates in Sacramento County jails.

2  117.   As a direct and proximate result of the wrongful acts and omissions of

3  Sacramento County as set forth above, Plaintiff has sustained general damages of

4  an estimated $3,000,000, according to proof, including, but not limited to: (a) the

5  serious physical pain and suffering from the daily repeated injury to his body; (b)

6  the severe emotional and mental distress caused by the daily infliction of physical

7  and psychological pain, including feelings of helplessness, anxiety, humiliation, and

8  the loss of a sense of security, dignity, and pride; (c) the cost of medical treatment;

9  (d) the cost of emotional and psychological therapy; and (e) the loss of future

10 economic damages to permanent physical disability.

## TWELFTH CAUSE OF ACTION

### Defendant Sacramento County, the SCSO
### Correctional Health Services Division, Grant Nugent, and Does 21-30

### Medical Malpractice

118.   Plaintiff hereby incorporates by reference paragraphs 1 through 54, inclusive,
as though set forth fully herein.

119.   Defendant Sacramento County operates the SCSD and its Correctional
Health Services Division.  Defendant Grant Nugent was the director of the
Correctional Health Services Division at the time of the events alleged herein.  Does
21-30 are employees and/or contractors that provide medical services for the
Correctional Health Services Division.

120.   Defendant Sacramento County, Grant Nugent, and Does 21-30 failed to
comply with professional standards in the treatment of Plaintiff's Injuries by failing
to: (a) send Plaintiff for surgery on his left foot to properly reconstruct the
calcaneal bone; (b) provide Plaintiff with the means to not bear weight on his feet
while they healed (e.g., a wheelchair); and (c) provide Plaintiff with shower and
bathroom facilities that were capable of assisting Plaintiff with necessary hygiene

1   and sanitation without causing Plaintiff unnecessary pain and unnecessary weight

2   bearing on his feet.

3   121.   As a direct and proximate cause of this negligence and failure to meet

4   applicable professional standards of care, Plaintiff suffered additional injury to his

5   calcaneal bone in his left foot.  This injury will likely result in serious permanent

6   disability to Plaintiff.

7   122.   The foregoing acts and omissions of Does 21 through 30 were committed with

8   unbridled malice that was despicable and done with full knowledge of the physical

9   and mental pain and suffering to Plaintiff.  As a result, punitive damages should be

10  awarded against Does 21-30.

# VII.

# PRAYER

**Wherefore**, Plaintiff prays for judgment against Defendants as follows:

1.      For general, consequential, and special damages in the sum set forth in each count according to proof;

2.      For punitive damages in a sum according to proof in Counts 1-2, 5-6;

3.      For reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988 in Counts 1-4;

4.      For reasonable attorney's fees and costs pursuant to California Civil Code §51 and §52 in Counts 8-9;

5.      For treble damages (3x consequential) in Counts 8-9;

6.      For cost of suit herein incurred for all counts; and

7.      For such other and further relief as the Court deems just and proper.


\\\

Dated: November 12, 2017                          Respectfully,




                                                  By:  /s/  Patrick H. Dwyer
                                                  Patrick H. Dwyer, SBN 137743
                                                  P.O. Box 1705; 17318 Piper Lane
                                                  Penn Valley, CA  95946
                                                  Tel: (530) 432-5407
                                                  Fax: (530) 432-9122
                                                  pdwyer@pdwyerlaw.com