1
2
3
4

Patrick H. Dwyer, SBN 137743
P.O. Box 1705, Penn Valley, CA 95946
Tel: (530) 432-5407; Fax: (530) 432-9122
Email: pdwyer@pdwyerlaw.com
Attorney for Plaintiff Aram Mkrtchyan

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

| | |
|---|---|
| Aram Mkrtchyan, an individual,<br><br>    Plaintiff<br><br>        v.<br><br>Sacramento County, California, a<br>county government and the<br>operator of the Sacramento County<br>Sheriff's Department and its<br>Correctional Health Services<br>Division; and the following persons<br>as individuals and in their capacity<br>as officials, employees or contractors<br>of Sacramento County:<br>Grant Nugent;<br>Nancy Gallagher;<br>Deputy Dominguez;<br>Deputy Yang;<br>Deputy Grout; and<br>Deputy  Meier,<br>    Defendants. | CASE NO.: 2:17-CV-2366-TLN-KJN<br><br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br><br>Date: June 2, 2022<br><br>Time: 2:00 pm<br><br>Courtroom: 2, 15th Floor<br><br>The Honorable Troy L. Nunley |

25
26
27
28

Plaintiff Aram Mkrtchyan ("Plaintiff") submits the following Memorandum in Opposition to Defendants Motion for Summary Judgment (ECF 69) on all Counts in the Third Amended Complaint ("TAC").

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

I.    Introduction ............................................................................ 1

II.   Background Facts For Counts 1, 4-5, 9-10, and 12 and Defendants
      Sacramento County, Dr. Grant Nugent, and Nancy Gallagher

      A.    Expert Witness Conclusions About Plaintiff's Injuries .......... 1

      B.    The Medical Time Line .................................................... 2

      C.    Additional Testimony of Grant Nugent and Nancy Gallagher
            Relating to Their Individual and Supervisory Liability and
            to Plaintiff's Monell Claim ............................................. 4

            1.    Dr. Nugent ......................................................... 4

            2.    Nancy Gallagher ................................................ 6

III.  Count I: Monell Liability for Sacramento County

      A.    Applicable Law ............................................................ 9

      B.    Sacramento County Failed to Have Appropriate Policies
            and Procedures or to Monitor and Enforce such Policies
            and/or to Supervise its CMU Staff .................................. 10

      C.    Summary and Argument ................................................ 12

IV.   Count 4: Supervisory Liability of Dr. Grant Nugent and
      Nancy Gallagher ................................................................... 13

      A.    Applicable Law for Supervisory Liability ........................... 13

      B.    Summary and Argument ................................................ 14

            1.    Dr. Nugent ......................................................... 14

            2.    Nancy Gallagher ................................................ 15

      C.    Argument .................................................................... 16

i

V.      Count 5: §1983 Deliberate Indifference of Nancy Gallagher

        A.     Applicable Law for Deliberate Indifference To Medical Care .      16

        B.     Argument ......................................................................

VI.     Count 9: Violation of CA Government Code § 845.6 by
        Nancy Gallagher ...................................................................      18

VII.    Counts 10 and 12: Sacramento County is Liable Under Both
        GC §845.6 and §815.2 for the Wrongful Conduct of Defendants
        Nugent and Gallagher ...........................................................      20

VIII.   Count 11: Dr. Nugent and Nancy Gallagher Medical Malpractice ..      20

IX.     Counts 2-3 and 6-8: The Deputy Defendants .....................................      21

        A.     Deputy Dominguez......................................................      21

        B.     Deputy Yang .............................................................      22

        C.     Deputy Grout ............................................................      23

        D.     Deputy Meier ............................................................      23

X.      No Qualified Immunity

        A.     Dr. Nugent and Nancy Gallagher .........................................      24

        B.     The Deputy Defendants ...............................................      25

XI.     Conclusion .......................................................................      25

ii

# TABLE OF AUTHORITIES

**Page**

**Ninth Circuit Court of Appeal**

*Russell v. Limitap,* 31 F.4th 729 (9th Cir. 2022) ....................................... 17, 19-20

*Sandavol v. County of San Diego,* 985 F.3d 657 (9th Cir. 2021) ............... 9, 17

*Gordon v. County of Orange,* 888 F.3d 1118 (9th Cir. 2018) .................... 18-19, 24

*Henry A. v. Willden,* 678 F.3d 991 (9th Cir. 2012) ................................... 13

*Jett v. Penner,* 439 F.3d 1091 (9th Cir. 2006) .......................................... 18-19, 24

*Dubner v. City & Cnty. of San Francisco,* 266 F.3d 959 (9th Cir. 2001).. 13

*Johnson v. Lewis,* 217 F.3d 726  (9th Cir. 2000) ....................................... 25

*Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir. 1991).............. 13

*Redman v. County of San Diego,* 942 F.2d 1435, 1446 (9th Cir. 1991) .... 13

**Federal District Court**

*Garcia v. Yuba County Sheriff's Department,* 559 F. Supp. 3d 1122
    (E.D. Cal. 2021) .................................................................................. 9n4

*Villarreal, et al. v. County of Monterey,* 254 F. Supp. 3d 1168
    (N.D. Cal. 2017) .................................................................................. 20

**California Statutes**

Government Code §845.6 ................................................................................ 19-20

Government Code §815.2 ................................................................................ 20

iii

I.   **Introduction**

Plaintiff filed a seperate MSJ that addresses claims 1, 4-5, 9-10, and 12. (ECF 71)("Plaintiff's MSJ").  Plaintiff did not file for summary judgment on Counts 2-3, 6-8 concerning the individual deputy Defendants Dominguez, Yang, Grout, and Meier ("Deputy Defendants") because, as described below, there are disputed material facts that a jury will have to decide. The reason there are still disputed material facts is the spoliation of the video evidence caused by Defendants' failure to place a litigation hold on the jail video.  The question of appropriate sanctions for this failure is pending before the Court in Plaintiff's Motion to Hear Request to Reconsider Orders On Motion for Spoilation (ECF 57 and 60).  Plaintiff contends that the Court should grant either directed verdicts or jury instructions with evidentiary presumptions on Counts 2-3 and 6-8 against the Deputy Defendants.

II.   **Background Facts For Counts 1, 4-5, 9-10, and 12 and Defendants Sacramento County, Dr. Grant Nugent, and Nancy Gallagher**

A.   **Expert Witness Conclusions About Plaintiff's Injuries**

The medical facts are not in dispute.  The experts for both sides agree that, as a result of the failure to timely send Plaintiff for a surgical consult for the calcaneal fracture in his right ankle, Plaintiff's foot healed with "malunion" and permanent deformity that causes Plaintiff significant pain and substantially impairs his physical activities.  PSUF 45-50, 60-63.[1]

In addition, Defendant's medical expert further pointed out that, because of

---

[1]      PSUF numbers match the SUF numbers in Plaintiffs MSJ (ECF 71-2).

1

the failure to timely surgically repair the foot, he would have recommended that Plaintiff have a subtalar fusion of his ankle as early as late January 2017, while Plaintiff was still in custody.  PSUF 51-55, 61, 64.  However, Defendants never mentioned the possibility of subtalar fusion surgery to Plaintiff before his release from custody on April 23, 2017.  PSUF 57-58.  Thus, there were *two* instances of deliberate medical indifference.[2]

### B.   The Medical Time Line

On August 29, 2016, Plaintiff fractured the calcaneal (heal) bone in his right foot in the exercise yard at the Defendant's RCCC jail.  PSUF 1.  On September 1, 2016, Plaintiff was radiographed and then on September 2nd he was diagnosed by the CHS's contract, in-house orthopedic surgeon, Dr. Kungys, with an impacted and comminuted right calcaneus fracture.  PSUF 2.  Dr. Kungys wrote a doctor's order referring Plaintiff to an outside orthopedic surgeon for "ORIF", which is open reduction and fixation surgery.  PSUF 3.  Dr. Kungys submitted his surgical referral to CMU the same day.  PSUF 4.  Dr. Kungys, who had performed this type of surgery, considered the injury  "serious" and he thought ORIF surgery was the preferred treatment approach. PSUF 5-6.  Both defense and plaintiff's experts agree that this was the preferred surgical repair for Plaintiff's ankle.  PSUF 45, 60, 63.

On September 2nd, after the diagnosis by Dr. Kungys, CHS's staff doctor Dr.

---

[2]      Plaintiff has filed a motion to amend the complaint to add a claim for additional deliberate indifference by failing to provide the subtalar infusion as Defendant's medical expert recommended (ECF 70).

2

Nageswaran noted in Plaintiff's medical record that Dr. Kungys had referred Plaintiff for an outside orthopedic surgical consult to repair his right foot.  PSUF 7.

On September 12, 2016, CHS doctor Dr. Janet Abshire saw Plaintiff and he asked her when he was going to be sent for surgery.  Dr. Abshire noted in Plaintiff's medical record that "Pt desires surgery as recommended. He knows there is a window of opportunity to do this. He states he did not refuse any visits." PSUF 10.  Both party's experts agreed there was a 2-3 week window for surgery.  PSUF 46, 60.

On September 23, 2016, Nancy Gallagher observed in Plaintiff's medical record that she did "not originally understand Dr Abshire's consult request" and the surgical consult had now been sent to outside provider.  PSUF 12.  The September 23rd notation by Gallagher does not mention the original ORIF referral by Dr. Kungys on September 2nd.  Further, the September 23rd notation by Gallagher does not express any urgency to the matter. PSUF 32-33.  Moreover, when asked at her deposition, *Gallagher could not find any entry in Plaintiff's medical record that he was ever referred for surgical consult.*  PSUF 34.

On October 2, 2016, Dr. Grant Nugent reviewed Plaintiff's chart and wrote a note on a "Consultation Case Management Request" form observing how serious Plaintiff's fracture was and asking Nancy Gallagher why Plaintiff had not yet been sent for outside surgical referral and CT scan. Dr. Nugent had no explanation how Plaintiff's case arrived on his desk.  PSUF 14.  Nugent had no explanation for why Plaintiff had not yet been sent for an outside ORIF consult by October 2, 2016, a month after the original referral by Dr. Kungys.  PSUF 15.  Dr. Nugent testified

3

that only Nancy Gallagher could explain why Plaintiff had not been timely sent for his ORIF consult.  PSUF 16.

On October 11, 2016, Plaintiff was finally seen by Dr. John Casey at San Joaquin General Hospital.  Dr. Casey told Plaintiff that it was too late for his ORIF surgery. PSUF 17. Dr. Casey testified at his deposition that if an inmate needed to be seen urgently, that could have been arranged on short notice of a day or two. PSUF 18.  He testified that he would have liked to have seen Plaintiff within two weeks of his injury. PSUF 19.  Dr. Casey further testified that Plaintiff should avoid stairs, have a lower tier, lower bunk assignment, and could have been given physical therapy. PSUF 20-22.  However, Plaintiff never had physical therapy and on multiple occasions Plaintiff was forced to walk on his injured foot and/or housed inappropriately – see TAC ¶¶ 27-31, 33-37, 39, 44-51.

C.  **Additional Testimony of Grant Nugent and Nancy Gallagher Relating to Their Individual and Supervisory Liability and to Plaintiff's *Monell* Claim**

1.  **Dr. Nugent:** began working at CHS in 2010 and became Medical Director of CHS in 2014 and served until 2019.  Prior to that, he had been an emergency room physician for thirty years.  PSUF 38.  As Medical Director, Dr. Nugent  was responsible for overseeing the medical services provided by CHS.  He did some clinical work, but spent most of his time doing patient chart review.  He reviewed medical correspondence with third party providers. He was responsible for policies and procedures and also for utilization review.  As for medical care, Dr. Nugent had ultimate responsibility. Dr. Nugent would look at referrals of inmates

4

to third party providers only when requested by the CMU.   PSUF 39.

Dr. Nugent testified that CHS had administrative procedures, but nothing that instructs about when a patient would be referred to an third party provider – that was the physician's decision according to the professional standard of care. There were no particular procedures used by CMU to refer patients.  PSUF 40.  A doctor that needed to refer a patient for outside care would use a Case Management Referral form (e.g., P. Ex 8) to describe the medical need and the type of referral requested.  These would be sent by the doctor to Nancy Gallagher in CMU.  Nancy Gallagher did not have authority to question the medical basis for the referral.  She would, however, check the referral for medicare reimbursement.  PSUF 41.

Dr. Nugent was unable to state how much time it should have taken for Plaintiff to be sent for his third party surgical review, even though the Case Management referral from Dr. Abshire on September 12th said "ASAP".  If the case was an emergency it would go to a local ER; otherwise, it would depend upon when the third party medical provider's schedule.  PSUF 42.

Dr. Nugent described a period of time where there was a delay in getting Case Management Referral forms scanned into the computer system.  Dr. Nugent testified that some records were delayed for up to a month in getting scanned into the medical files and CHS was "thousands of records behind at one point."  In addition to input scanning problems, there was a problem with backlog when the Case Management Referral forms were "printed out, and they end up in this huge pile, and then they [CMU] go through them.  It's a very inefficient method, in my

opinion, unfortunately, because there is no staff there to do the work." Dr. Nugent had no other explanation for why electronic medical records as of October 9[th] still did not have any orthopedic referral notation for Plaintiff. PSUF 43.

Dr. Nugent testified that Plaintiff's case was not the only instance of undue delay between the CHS doctor's referral order and the third party consult. He testified that there were some cases of delay because Sacramento County just would not pay for the necessary third party contracts to obtain the necessary medical services. PSUF 44.

2. **Nancy Gallagher**: was the head of the Case Management Unit ("CMU") within Defendant Sacramento County's Correctional Health Services ("CHS") since early 2000. The CMU was responsible for making appointments with third party medical providers for inmates when a CHS doctor wrote a referral for services not available it the jail. Nancy Gallagher was personally responsible for making the appointments for all patient referrals. PSUF 24.

Gallagher testified that procedurally, CHS doctors would write a referral (i.e, a doctor's order) for a consult, that request would go into the jail medical records, and such referrals would be pulled off the electronic files and given to the CMU. However, sometimes the doctor's referral would be faxed to the CMU. PSUF 25.

The CMU would typically take up to a week to process a doctor's referral for an outside consult. There would typically be about five orthopedic referrals every week. If the doctor called her and said this is really urgent, she would send them to an ER. PSUF 26. Nancy Gallagher testified that she would not look at an inmate's

6

medical record (for example, P Ex. 13) for her CMU duties and she did not look at Plaintiff's medical records with regard to his referral, only to the Case Management Referral document (P Ex. 8) PSUF 28. Nancy Gallagher testified that she had no memory about Plaintiff's referral. She agreed from the referral notes that Plaintiff needed to be sent to an outside orthopedic surgeon. PSUF 27.

Nancy Gallagher was unable to explain the meaning or medical significance of the notation by Dr. Abshire on September 12, 2016, that says ""Pt desires surgery as recommended. He knows there is a window of opportunity to do this." Gallagher admitted that she understood that bones have a certain time period for healing and that time period would be an important factor for an orthopedic surgeon to take into consideration about when and if they can perform surgery. When asked if she had any concern on September 23rd about whether Plaintiff's calcaneal bone had started to heal and that might prevent corrective surgery, Gallagher said "no". PSUF 32.

Nancy Gallagher testified that she had no memory about the note from Dr. Nugent (P Ex. 11) or even why Dr. Nugent was looking at Plaintiff's file on October 2, 2016. She further stated that "... I really don't understand this communication" from Dr. Nugent (P Ex. 11). However, in apparent contradiction, Gallagher then stated that she and Dr. Nugent would have a weekly "sit down" review of cases needing outside referral. PSUF 33.

Nancy Gallagher was asked in deposition to review Plaintiff's medical record (P Ex. 13) and find any entry indicating if and when CMU had actually made a referral request for Plaintiff. She was unable to find any such notation. Nancy

7

Gallagher was then asked about her notation on September 23rd about Plaintiff

needing a orthopedic consult and the absence of any entry in the medical record

confirming that the referral had, in fact, been made.  She testified that she was

unable to locate any such referral confirmation anywhere in Plaintiff's records and

that she thought the referral had been made verbally by the "medical transport

person who talked to San Joaquin special care."  PSUF 34.  When asked why it took

until October 11, 2016 for Plaintiff to be seen by an outside orthopedic surgeon to

evaluate surgical repair of his fracture, Nancy Gallagher said "I have no idea."

PSUF 35.  Nancy Gallagher then testified that she had no heightened concern over

the fact that as of September 23rd, Plaintiff had not yet been sent for his surgical

referral.  When asked if Plaintiff's case had been handled in the usual manner by

CMU, she testified that Plaintiff's case was handled in a manner similar to other

"ortho consults."  PSUF 36.

Nancy Gallagher was then asked if there had been other instances of ortho

patients not being timely sent for surgical referral. She responded "[i]t has

happened before."  She could not give any estimate as to how many times or how

often this had happened, only that it was "infrequent".  PSUF 37.[3]

---

[3]      Nancy Gallagher testified that she kept the records for her CMU
referrals as a paper file in her office.  She retained these documents for 3-4 years.
She has no recollection of anyone every coming to her and asking her for Plaintiff's
CMU records.  Further, as of the date of her deposition (04/28/21) no one had asked
her to look for Plaintiff's CMU records.  PSUF 29.  Gallagher confirmed that her
paper files would have contained the information about when a third party referral
was actually made for Plaintiff.  PSUF 30.

III.   **Count I:** *Monell* **Liability for Sacramento County**

A.   **Applicable Law** – Under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978) the County can be liable under § 1983 if its "policy or custom" caused plaintiff's injuries through deliberate indifference to his constitutional right to adequate medical care. see also *Castro v. County of Los Angeles*, 833 F.3d 1060, 1073 (9th Cir. 2016)("*Castro*"), 833 F.3d at 1073; *Sandavol v. County of San Diego*, 985 F.3d 657, 681 (9th Cir. 2021) ("*Sandavol*").

There must be shown a direct causal link between the defendant's alleged acts or omissions and the plaintiff's harm. *Castro* at 1075; *Sandoval* at 681. This is done by showing, under an *objective* standard, there was deliberate indifference by the defendant to the right to medical care. *Sandoval* at 682.   For example, a plaintiff will need to show that defendant had actual or constructive knowledge that its practices were "substantially certain to cause a constitutional violation." *Sandoval* at 682 (quoting from *Castro* at 1076).

However, this objective standard does not require proof of a prior injury.[4]  A plaintiff need only show that another constitutional injury *was substantially certain*

---

[4]      A recent example of a single instance of injury being sufficient for a *Monell* claim is presented in *Garcia v. Yuba County Sheriff's Department*, 559 F. Supp. 3d 1122 (E.D. Cal. 2021). The District Court found that the allegation of a single instance of the Vacaville police sending an officer, who had no training in dealing with suspects suffering from a mental health crisis, to respond to a call for assistance regarding a suicidal man, met the deliberate indifference requirement for a municipal §1983 action.  The court found that "[s]erious injuries and death are the obvious and highly predictable consequences of sending untrained and armed officers to respond to mental health crises" and the failure to train in such a crucial area met the deliberate indifference requirement for pleading. *Id.* at 6.

*to occur* from the deficient policy or practice.  To require affirmative proof would

mean that every defendant in a *Monell* claim would get "'one free ... pass' for

policies or practices that are substantially certain to violate an individual's

constitutional rights." *Sandoval at 682 (*quoting from *Woodward v. Corr. Med.

Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004).

B.    **Sacramento County Failed to Have Appropriate Policies
and Procedures or to Monitor and Enforce such Policies
and/or to Supervise its CMU Staff**

Plaintiff's MSJ did not seek judgment under Count 1, TAC ¶ 62, because

Plaintiff has insufficient evidence to support a failure to train allegation.

However, Plaintiff does have sufficient evidence for summary judgment

under *Monell* in Count 1, TAC ¶ 61, the failure to have appropriate policies and

procedures for making timely referrals of inmates to third party medical providers,

and Count 1, TAC ¶¶ 63-65 for failure to monitor, enforce, and supervise.[5]

Dr. Nugent testified that Sacramento's CHS did not have any specific policies

about when a patient would be referred for third party orthopedic consults and

there were no particular procedures in place.  PSUF 40.  Dr. Nugent testified about

a period of time where the CMU was thousands of inmate referrals behind, PSUF

43, and that inmate medical referrals were sitting in a big pile on Nancy

---

[5]    Plaintiff's *Monell* claim has been adversely affected by the loss of the
CMU paper medical files which might have shown other instances where inmates
were not timely referred to an outside medical provider.  PSUF 29. See Plaintiff's
pending Request to Reconsider Orders Re Motion for Sanctions for Spoilation (ECF
65).  Plaintiff has requested either a directed verdict or a presumption that the lost
evidence would support his claims under Count 1.

Gallagher's desk in the CMU.  PSUF 43.  Dr. Nugent also testified about instances where inmate patients were not timely referred for third party medical care.  PSUF 44.  Further, he testified about the reluctance of Sacramento County to spend the money to have appropriate third party medical provider contracts.  PSUF 44.

These CHS policy and procedure failures obviously created a situation of *deliberate indifference* to inmate health care that *was more likely than not to result in the failure to timely send an inmate for medical care*.  The inevitable result would be that an inmate(s) would be denied essential medical treatment. That is exactly what happened to Plaintiff: the CHS policies and practices in place for outside medical referrals were non-existent and/or in disarray.  As the direct consequence, Plaintiff was sent about a month too late to receive the medical treatment he needed.  Plaintiff was left with a malunion of his ankle and permanent disability.

Dr. Nugent's testimony about Plaintiff's case proves the causal effect of the CHS deliberate indifference. He testified that he finally reviewed Plaintiff's chart about a month after Plaintiff's orthopedic surgical referral.  PSUF 14.  Dr. Nugent had no explanation for why Plaintiff had not been sent for outside ORIF consult.  PSUF 15.  Dr. Nugent placed the blame squarely on Nancy Gallager who ran the Case Management Unit.  PSUF 16.  Further, Dr,. Nugent was unable to state how long it should have taken to send Plaintiff out for his ORIF surgical referral.  PSUF 42.

Nancy Gallagher's testimony about Plaintiff's case also reveals the

11

inadequacy and failure of the CHS policies and practices to provide timely medical care to Plaintiff. She testified that the CMU was responsible for all inmate referrals to third party medical providers and it typically took about a week to make a referral. PSUF 24-26. Gallagher testified that she had no idea *when* Plaintiff's referral was actually made, PSUF 34, and that she had no idea why it took until October 11, 2016 for Plaintiff to see the outside orthopedic surgeon, Dr. Casey. PSUF 35. Gallager testified that Plaintiff's case was handled in the usual manner, PSUF 36. Nancy Gallagher then admitted that there had been similar instances where an inmate had not been timely sent for outside referral. PSUF 37.

## C.   Summary and Argument

The testimony of Dr. Nugent and Nancy Gallagher shows that CHS policy failures concerning referral of inmates to outside medical providers were the direct cause of deliberately indifference to inmate medical care. Further, the evidence demonstrates, under an objective standard, that other constitutional injuries were *substantially certain to occur* as a result of the obviously deficient policies and practices. Indeed, both Dr. Nugent and Nancy Gallagher testified that there had been such other instances. Finally, the evidence shows that the failures of Sacramento's CHS unit were, in part, due to Sacramento's unwillingness to provide sufficient funding for third party medical referrals.

The Court should deny Defendants' motion on this claim and grant summary judgment for Plaintiff on TAC ¶¶ 61 and 63-65.

IV.  **Count 4: Supervisory Liability of Dr. Grant Nugent and Nancy Gallagher**

Plaintiff alleged that Nancy Gallagher, as the head of the CMU, and Dr. Nugent, as the CHS Medical Director, were supervisors with direct responsibility for Plaintiff's medical care.  The facts as set forth in Section II.D.1-2, *supra*, show that both of them failed to supervise the medical staff and that those failures were not just mere acts of negligence, but constituted deliberate indifference that was the direct cause of Plaintiff's injury.

A.  **Applicable Law for Supervisory Liability**

Supervisors may be held liable under §1983 upon a showing of either: (a) personal involvement in the constitutional deprivation; or (b) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *Henry A. v. Willden*, 678 F.3d 991, 1003-04 (9th Cir. 2012) (citing *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011)).

Supervisory liability is not dependent upon direct participation by the supervisor. *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).  If the supervisor initiates the wrongdoing, for example, by instituting an unconstitutional policy, then there is liability even thought the unconstitutional acts/omissions are performed by subordinate personnel. *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir. 1991).  Similarly, supervisors have been held to answer for a failure to protect inmates at a county jail when they knew or should have known that acts/omissions by subordinates caused multiple constitutional injury. *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 968 (9th Cir. 2001).

13

B.     **Summary and Argument**

Referring to the facts established in Section II.D.1-2, *supra*:

1.     **Dr. Nugent:** As the Medical Director, was responsible for CHS policies and procedures and for patient care, which included medical chart review, referrals, and oversight of the CMU.   As the supervisor of CHS, he should have known within days of September 2nd whether Plaintiff's referral had been made.

Certainly, if Dr. Nugent had been keeping up with his chart review and other means of supervision, he would have known by September 12th, when Dr. Abshire made a second orthopedic referral, that Plaintiff's first referral had not happened. Moreover, there is no excuse for Dr. Nugent failing to raised a red flag on September 23rd when Nancy Gallager made a note in Plaintiff's medical record about not yet making the referral.  Dr. Nugent's failure to even become aware of the problem until October 2nd, is a testament to his multiple supervisory failures.

Dr. Nugent had no explanation for the failure to know about the failure to refer Plaintiff, despite the fact that he did *patient chart review* and was responsible for the policies and procedures that should have been in place to prevent exactly this type of situation. Dr. Nugent was about a *month behind* in doing patient chart reviews when he discovered the problem with Plaintiff's referral to an orthopedic surgeon.  Being thirty days behind in chart review, which is a critical function to ensure patient care, proves neglect, if not gross neglect, in performing his supervisory duties.

Dr. Nugent testified that similar failures to timely refer inmates to third

14

party providers had happened before.  He indicated that the problem was due to both poor record keeping and an apparent reluctance of Sacramento County to properly fund patient care by third party providers. Dr. Nugent, as Medical Director, had immediate responsibility for implementing the procedures and policies to make sure that patient referrals were promptly entered into the medical records and then carried out by CMU.  He was certainly responsible as the top CHS supervisor for preventing a large pile of medical referrals collecting on Nancy Gallagher's desk. As for County reluctance to budget for medical needs, Dr. Nugent should have made a written report/request to his supervisors about the inadequacy of funding and its harm to patients.  There is no record of him doing this.

       2.   **Nancy Gallagher**: As the CMU supervisor, was responsible for making sure that: (a) Case Management Referral forms were timely entered into the medical records; and (b) referrals were made in a timely manner.  Dr. Kungys sent a CMU referral on September 2nd, but that referral never appeared in Plaintiff's medical file and was never acted upon. Then on September 12th, Dr. Abshire put a second entry into the medical record for an orthopedic surgical referral, which according to Gallagher's own testimony, should have alerted the CMU to make such a referral. When asked if she had any concern on September 23rd about whether Plaintiff's calcaneal bone had started to heal and that might prevent corrective surgery, Nancy Gallagher said "no".  When she was asked about her notation on September 23rd about Plaintiff needing a orthopedic consult, she was then unable to locate any confirmation of his referral anywhere in Plaintiff's record.  When

15

asked why it took until October 11, 2016, for Plaintiff to be seen by Dr. Casey, Nancy Gallagher said "I have no idea." When asked if Plaintiff's case had been handled in the usual manner by CMU, she testified that it was handled in a manner similar to other "ortho consults."

Nancy Gallagher testified that she could make a medical referral as quickly as 1-2 days, which matches the testimony of Dr. Casey that appointments for urgent cases could be made that quickly. Dr. Nugent belatedly flagged the failure to refer Plaintiff on October 2nd, but Plaintiff still was not seen until October 11th.

C.   **Argument**

Applying the law to the facts for the Fourth Cause of Action is simple: both Dr. Nugent and Nancy Gallagher failed to carry out their respective supervisory responsibilities respecting the referral of Plaintiff for an outside orthopedic ORIF evaluation.  Their respective failures as supervisors were not a single incident, but part of a pattern of failures that demonstrated that the wrongful conduct was not mere negligence, but deliberate indifference.[6]  In turn, their repeated supervisory failures were the direct cause of Plaintiff's injuries.

V.   **Count 5: §1983 Deliberate Indifference of Nancy Gallagher**

A.   **Applicable Law for Deliberate Indifference To Medical Care**

The Ninth Circuit has issued several recent opinions about the transition

---

[6]     Even with the "loss" of Nancy Gallagher's CMU paper medical files because of the failure to place a litigation hold, there is more than enough evidence to prove the failure of both Nancy Gallagher and Dr. Nugent to properly supervise.

16

from a *subjective* to *objective standard* in deliberate indifference cases for pre-trial

detainees under the 4th amendment.  See *Russell v. Limitap*, 31 F.4th 729 (9th Cir.

2022) 2022 WL 1098970 ("*Russell*"); *and Sandoval v. County of San Diego*, 985 F.3d

657 (9th Cir. 2021) ("*Sandoval*").  Under the objective standard, pretrial detainees

alleging that jail officials failed to provide constitutionally adequate medical care

must prove the following elements:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined [including a decision with respect to medical treatment];
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

The new objective standard relates primarily to the third element and was

characterized by the Ninth Circuit as "akin to reckless disregard" for the medical

needs of the detainee.  A plaintiff no longer has to prove the subjective intent of the

medical personnel to cause harm or actual knowledge that they were causing harm,

only that the medical personnel should have provided timely and proper medical

treatment under a professional medical standard of care.  *Russell* at p.738-744.  In

*Russell*, the Court of Appeals found that the treating doctor and several nurses

could be held liable for the death of a detainee where the detainee was in "serious

17

medical need" such that a "failure to treat a prisoner's condition could result in

further significant injury or the unnecessary and wanton infliction of pain."  See

also, *Gordon v. County of Orange*, 888 F.3d 1118  (9th Cir. 2018)("*Gordon*").

The most analogous case to that of Plaintiff is *Jett v. Penner*, 439 F.3d 1091,

1096 (9th Cir. 2006)("*Jett*"), a pre-*Gordon* decision under the 8th amendment's

subjective standard, where the Ninth Circuit overturned a summary judgment in

favor of defendants.  In *Jett*, the prison doctor (Penner) diagnosed a broken thumb

as needing a referral to an orthopedic surgeon for setting and casting.  However, the

doctor failed to actually make the referral for many months.  The Court overturned

the District court's grant of summary judgment for Dr. Penner, observing that the

long delay was not a matter of a medical mistake, it was a failure to make a timely

orthopedic referral. The thumb healed incorrectly, causing increased pain and usage

problems with plaintiff's hand, which met the requirement for serious harm.  The

jury would decide if there was deliberate indifference.

B.   **Argument**

In this action, three CHS doctors instructed CMU to make a surgical referral

for Plaintiff: Dr. Kungys, Dr. Abshire, and Dr. Nageswaran.  All three medical

experts (Drs. Casey, Ghalambor, and Younger) agree that there was a serious

medical need and that the failure to timely treat Plaintiff's calcaneal fracture with

ORIF surgery caused Plaintiff further serious injury.  Nancy Gallagher testified that

it normally took a week to make a referral, but this did not happen for about six

weeks in Plaintiff's case.  Dr. Casey said it could have been done in 1-2 days if

necessary.  Failure to make the referral to Dr. Casey in time was not just negligence: it was grossly negligent and in callous disregard of Plaintiff's medical needs.

Under the recent decisions in the *Gordon*, *Sandoval*, and *Russell* , Plaintiff only needs to show that there was a "serious medical need" and that under prevailing medical standards of care a "failure to treat" Plaintiff's calcaneal fracture would likely "result in further significant injury or the unnecessary and wanton infliction of pain." He has overwhelmingly proven those elements in his MSJ.

## VI.   Count 9: Violation of CA Government Code § 845.6 by Nancy Gallagher

Plaintiff has moved for summary judgment against Nancy Gallagher for failure to provide medical care under California Government Code §845.6.[7]   Under this statute, a county jail employee is liable for an injury proximately caused to an inmate if: (a) the jail employee is acting within the scope of employment; (b) knows or has reason to know that the inmate is in need of immediate medical care; and (3) fails to take reasonable action to summon medical care. *Jett* at 1099.  In *Jett*, the Ninth Circuit construed the statute to cover situations where a medical condition was diagnosed, but the inmate was not timely send for medical treatment.  It found that "immediate medical care" *included "both diagnosis and treatment"* and therefore, the need for "immediate medical care" can arise more than once in relation to an ongoing medical condition. Finally, it observed that "without such an

---

[7]    Plaintiff is not dismissing its claims against the other defendants named under this Count. Plaintiff thinks that a jury will need to decide whether the evidence presented at trial against the other Defendants is sufficient under the law.

interpretation, § 845.6 would create the cruel illusion that a prisoner would receive

both diagnosis and treatment" for his medical condition. See *also, Villarreal, et al. v.*

*County of Monterey*, 254 F. Supp. 3d 1168, 1187 (N.D. Cal. 2017)("*Villarreal*").

In this case, Plaintiff had been diagnosed with a calcaneal fracture and was

referred by Dr. Kungys for surgical treatment, but no surgical treatment was ever

provided.   This is an almost identical situation to that in *Jett*.

## VII.   Counts 10 and 12: Sacramento County is Liable Under Both GC §845.6 and §815.2 for the Wrongful Conduct of Defendants Nugent and Gallagher

Although Plaintiff pleaded these two statutory basis for liability as separate

causes of action, the legal argument can be made jointly.   Defendant Sacramento

County is liable for the wrongful conduct of Nancy Gallagher under GC §845.6

because the statute says a "public entity" is liable for the failure to summon medical

care by an employee acting within the scope of employment.   In addition,

Sacramento County would also be liable under GC §815.2. *Villarreal* at 1188-89.

## VIII.   Count 11: Dr. Nugent and Nancy Gallagher Medical Malpractice

Plaintiff's and Defendant's medical experts concluded that, as a result of the

failure to timely send Plaintiff for a surgical consult for the calcaneal fracture in his

right ankle, Plaintiff's foot healed with "malunion" and permanent deformity that

causes Plaintiff significant pain and substantially impairs his physical activities.

PSUF 45-50, 60-63.   This failure certainly did not meet the professional standard of

care.   As discussed under Sections IV and V, *supra*, the responsibility of both Nancy

Gallagher and Dr. Nugent for this failure is unquestionable.   Defendant's Summary

20

judgment should be denied, and instead, should be granted for Plaintiff.  See *Russell* at 738-744, where the 9th Circuit observes that medical malpractice is a mere negligence standard and that where a § 1983 deliberate indifference is shown, malpractice would also have been proved.

## IX.   **Counts 2-3 and 6-8: The Deputy Defendants**

The Defendants failure to place a litigation hold and subsequent loss of the jail video prevents either party from prevailing on a summary judgment motion on Counts 2-3 and 6-8.[8]  The individual Defendant Deputies admit almost all of the TAC allegations about the time and place of the alleged wrongful events, but they deny the crucial facts that would establish their liability.  Plaintiff testified to the specific wrongful acts and omissions, but other than his testimony, cannot present conclusive evidence. The lost video would likely have provided this evidence.  Thus, unless the Court directs a verdict for Plaintiff or grants a jury instruction presuming that Plaintiff's allegation are true as requested in Plaintiff's Spoilation motion (ECF 57, 60), these claims will have to go to the jury for decision.

A.   **Deputy Dominguez** – Plaintiff alleges in TAC ¶¶ that Deputy Dominguez violated Plaintiff's constitutional rights in several ways following Plaintiff's transfer on September 6, 2016 from the RCCC Jail to the Main Jail,

---

[8]   These counts were already found by the Court to allege the legal elements for the respective causes of action (ECF 20).  Thus, the legal arguments made by Defendants have already been successfully rebutted by Plaintiff.  What is left to decide are the material issues of fact, which as noted, cannot be decided definitively because of the video spoilation.  Moreover, Plaintiff only has 25 pages.

including calling him a Jihadist, taking his crutches, placing him a very small cell where Plaintiff's injured leg could not rest without pain, ignoring Plaintiff's request to use the restroom for so long that Plaintiff had to urinate on the floor, then ignoring Plaintiff's complaint of chest pains and delaying medical staff seeing Plaintiff for about an hour, then even after he was seen by medical personnel, delaying Plaintiff's being taken to medical for about six hours.  TAC ¶¶ 36-38. Plaintiffs testified to these same events at his deposition. PSUF 70-73.

Defendant Dominguez denied Plaintiff's specific allegations of wrongdoing in the TAC at ¶¶ 36-38 in his deposition. PSUF 81.  However, Deputy Dominguez's testimony substantially corroborated plaintiff's specific allegations about the date and time of the events, the description of the two cells that Plaintiff was held in, that inmates do sometimes urinate on the floor of the cell where Plaintiff was first held at the Main Jail, and that there is an emergency button in the second cell where Plaintiff was kept.

B.     **Deputy Yang** – Plaintiff alleges in TAC ¶¶ 46-47 that Deputy Yang ignored Plaintiff's chrono for a lower tier bunk and refused to give plaintiff any blankets unless he shaved his beard.  Plaintiff's deposition testimony substantiated these allegations. PSUF 74.

Defendant Deputy Yang denied Plaintiffs specific allegations at his deposition. PSUF 77.  Deputy Yang did testify that he remembered Plaintiff's appearance, but did not remember the allegations about the bunk assignment or blankets.  However, Yang did describe a room where there was a mirror for shaving and that officers

22

would loan clippers to inmates to shave their beards, that the cell Plaintiff was placed

into had an air vent near the upper bunk, and that with an upper level cell Plaintiff

would have to use the stairs.  PSUF 78.

C.    **Deputy Grout** – Plaintiff alleged in TAC ¶ 49, that Deputy Grout refused

to assign Plaintiff a lower tier bunk even though Plaintiff showed him a chrono for

this.  Plaintiff also alleged that Grout told him to stop fabricating the problem with

his foot, and further, that Grout just watched and offered no assistance as Plaintiff

tried to go up the stairs to an upper tier, but Plaintiff was unable.  Plaintiff testified

at his deposition to these allegations.  PSUF 76.

Defendant Deputy Grout denied Plaintiffs specific allegations at his deposition.

PSUF 79.  Grout denied ever saying any such thing to Plaintiff refusing to assign

Plaintiff to a lower bunk.  Grout testified that he though Plaintiff intentionally slid

down the stairs.  PSUF 76.

D.    **Deputy Meier** – Plaintiff alleged in TAC ¶ 48, that Deputy Meier, who

escorted Plaintiff to and from the medical unit after he fell on the stairs trying to

navigate between the upper tier and lower tiers, refused to give Plaintiff either a

wheelchair or crutches when Plaintiff left the medical unit to go back upstairs to his

assigned tier.  Instead, Deputy Meier let Plaintiff alternate between hopping,

kneeling, and crawling across 30 feet to get into the elevator.  PSUF 75.

Deputy Meier said he did not specifically remember the incident, however, he

said that when an inmate leaves medical with a cell clearance, he would not give the

inmate any mobility assistance and "[i]f he wants to hop on his way back to the floor,

1   if he wants to crawl, as long as he goes where he's directed to go, it's not my concern."

2   PSUF 80.

3
4   X.   **No Qualified Immunity**

5        A.   **Dr. Nugent and Nancy Gallagher**

6        Defendants assert qualified immunity for Dr. Nugent and Nancy Gallagher on

7   the grounds that there was no clearly established law regarding the

8   unreasonableness of their conduct, relying upon *Horton by Horton v. City of Santa*

9   *Maria*, 915 F. 3d  592, 599 (9th Cir. 2019), citing to *Gordon v. County of Orange*, 888

10

11  F.3d 1118, (2018).  This argument has no merit.

12       Plaintiff refers the Court to *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.

13  2006)("*Jett*"), a pre-Gordon decision under the 8th amendment's subjective standard,

14
15  where the Ninth Circuit overturned a summary judgment in favor of defendants.  The

16  prison doctor diagnosed a broken thumb as needing a referral to an orthopedic

17  surgeon for setting and casting.  However, the doctor failed to make the referral for

18  many months.  The Ninth Circuit overturned a grant of summary judgment for the

19
20  doctor, observing that the long delay was not a matter of a medical mistake, *it was a*

21  *failure to make a timely orthopedic referral*. The thumb healed incorrectly, causing

22  increased pain and usage problems with plaintiff's hand, which met the requirement

23  for serious harm.  There can be no question that *Jett* put both Dr. Nugent and Nancy

24  Gallagher on clear notice that deliberate indifference to an inmate's need for an

25
26  outside orthopedic consult would be actionable conduct under §1983.  See also,

27  *Wilhelm v. Rotman*, 680 F. 3d 1113, 1123 (9th Cir. 2012) where the 9th Circuit, citing

28                                              24

to *Jett*, ruled for a plaintiff inmate who had been denied timely hernia surgery.

### B.   The Deputy Defendants

The Defendant Deputies assert qualified immunity on the ground that there is no prior established law concerning the alleged wrongdoing.  They are quite mistaken.  Dominguez deprived Plaintiff of his crutches, placed him for an extended period in a cramped room, denied toilet access, and then denied/delayed medical care for hours.  Yang denied Plaintiff a lower tier bunk, forcing him to use stairs in his disabled condition, then made a personal/religious slander about his beard, and then denied him blankets.  Grout was shown a chrono for lower tier bunk, but sent Plaintiff to an upper tier bunk, despite Plaintiff's disability.  Grout later watched as Plaintiff fell down the stairs as result of the upper tier assignment. Meier let Plaintiff hop and crawl across the floor into the elevator, stating that "was not his concern".

It has long been established that prison officials and guards must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000).  The actions of these four deputies clearly violated this long established law.  Moreover the Defendant Deputies did these acts *intentionally* to harass and demean Plaintiff.  Prison guards have long been on notice that harassing and demeaning inmates is unconstitutional.

### XI.   Conclusion

Defendants' Motion for Summary Judgment Should be Denied.

Dated: May 12,  2022                Respectfully,
                                    By: /s/  Patrick H. Dwyer
                                    Patrick H. Dwyer, counsel for Plaintiff

25