1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT

8                 FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   ARAM MKRTCHYAN,                          No.  2:17-cv-02366-DAD-KJN

11                Plaintiff,                   ORDER GRANTING IN PART AND
                                              DENYING IN PART DEFENDANTS'
12        v.                                  MOTION FOR SUMMARY JUDGMENT
                                              AND DENYING PLAINTIFF'S MOTION
13   SACRAMENTO COUNTY, et al.,               FOR PARTIAL SUMMARY JUDGMENT

14                Defendants.                  (Doc. Nos. 69, 71)

15

16        This matter is before the court on the parties' cross-motions for summary judgment.

17   (Doc. Nos. 69, 71.)  Defendants move for summary judgment in their favor on all of plaintiff's

18   claims, and plaintiff moves for summary judgment in his favor with respect to his first, fourth,

19   fifth, ninth, tenth, and twelfth claims.  (*See id.*)  The pending motions were taken under

20   submission by the previously assigned district judge on May 20, 2022.[1]  (Doc. No. 77.)  For the

21   reasons set forth below, the court will grant in part and deny in part defendants' motion for

22   summary judgment and deny plaintiff's motion for partial summary judgment.

23   /////

24   /////

---

[1]  On August 25, 2022, this case was reassigned to the undersigned.  (Doc. No. 122.)  The
undersigned has endeavored to work through a backlog of inherited submitted motions in civil
cases as quickly as possible since returning to the Sacramento courthouse.  However, the court
faced challenges in expeditiously resolving the pending motions in particular due to the parties'
briefing, which the court found to be unnecessarily lengthy in some respects and not particularly
complete or helpful in others.

1

**PROCEDURAL BACKGROUND**

2

On November 12, 2017, plaintiff Aram Mkrtchyan filed the complaint initiating this civil

3

rights action.  (Doc. No. 1.)  Following the court's rulings on a motion to dismiss and a motion

4

for reconsideration, and pursuant to a stipulation by the parties, plaintiff filed the operative third

5

amended complaint ("TAC") on July 29, 2021.  (Doc. No. 40.)

6

In his TAC, plaintiff asserts claims under 42 U.S.C. § 1983 for deliberate indifference to

7

his medical needs in violation of the Fourteenth Amendment against defendant Sacramento

8

County (the "County") (claim 1); defendants Sacramento County Sheriff Department Deputies

9

Dominguez, Yang, Meier, and Grout (the "deputy defendants") in their individual capacities

10

(claim 2); defendants Dr. Grant Nugent and Nurse Nancy Gallagher in their supervisory

11

capacities (claim 4); and defendant Nurse Gallagher in her individual capacity (claim 5).  (Doc.

12

No. 40.)  In addition, plaintiff asserts a federal claim for the intentional infliction of emotional

13

distress ("IIED") against the deputy defendants (claim 3).  (*Id.*)  Furthermore, plaintiff asserts

14

state law claims for IIED against the deputy defendants (claim 6); negligence against the deputy

15

defendants (claim 7); violation of the Bane Act, California Civil Code § 52.1, against the deputy

16

defendants (claim 8); failure to summon medical care in violation of California Government Code

17

§ 845.6 against the deputy defendants (claim 9); violation of California Government Code §§

18

815.2(a) and 815.6 against the County (claim 10); medical malpractice against defendants Dr.

19

Nugent and Nurse Gallagher (claim 11); and failure to provide timely medical care for inmates in

20

violation of California Government Code § 845.6 against the County (claim 12).  (*Id.*)

21

Defendants filed a motion for summary judgment on April 28, 2022.  (Doc. No. 69.)  The

22

same day, plaintiff filed his own motion for summary judgment.  (Doc. No. 71.)  On May 12,

23

2022, the parties filed their respective opposition briefs.  (Doc. Nos. 73, 74.)  The cross-motions

24

for summary judgment were taken under submission on the papers by the previously assigned

25

district judge on May 20, 2022.  (Doc. No. 77.)  On May 23, 2022, defendants filed a reply in

26

support of their motion for summary judgment.  (Doc. No. 78.)  After receiving an extension of

27

time in which to do so, on May 27, 2022, plaintiff filed a reply in support of his motion for

28

summary judgment.  (Doc. No. 80.)

On July 11, 2023, the undersigned granted plaintiff's request for judicial notice of the existence of the court's decision in *Mollica v. County of Sacramento*, No. 2:19-cv-02017-KJM-DB, 2023 WL 3481145 (E.D. Cal. May 16, 2023).  (Doc. No. 94.)  On September 30, 2023, the undersigned denied plaintiff's motion for leave to file a fourth amended complaint, and on October 10, 2023, the undersigned denied plaintiff's request for a continuance with respect to the court's ruling on defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(d).  (Doc. Nos. 96, 97.)

## FACTUAL BACKGROUND[2]

This case encompasses claims based on a number of incidents that purportedly transpired during plaintiff's confinement in the County's jails between July 12, 2016 and April 23, 2017, including the alleged failure of certain defendants to promptly send plaintiff out for a necessary orthopedic surgical consultation to address a calcaneal fracture (fracture to the heel bone) that plaintiff sustained while being held at the Rio Cosumnes Correctional Center ("RCCC") Jail in August 2016 and various other unrelated occurrences involving the deputy defendants at the County's Main Jail.

**A.      The Named Defendants**

Plaintiff names seven defendants in the TAC.  (Doc. No. 40.)  While plaintiff's statement of undisputed facts sheds light on the role of defendants Nurse Gallagher and Dr. Nugent in the events alleged by plaintiff, neither party clearly explains in their respective statements the roles of the remaining defendants.  However, in the operative TAC, plaintiff alleges that the County is a public entity that operates and manages the Sacramento County Sheriff's Department ("SCSD"), which is responsible for the staffing and operation of the Main Jail at 651 I Street, Sacramento, California and the RCCC Jail.  (*Id.* at ¶ 5.)  Plaintiff also alleges that the four deputy defendants

---

[2]  This factual background is undisputed, except where otherwise noted, and is derived from the undisputed facts as stated by defendants and responded to by plaintiff (Doc. No. 78-1 at 2–35 ("DUF")), plaintiff's separate statement of undisputed facts in opposition to defendants' motion for summary judgment as responded to by defendants (Doc. No. 78-1 at 36–61 ("PSUF")), and the undisputed facts as stated by plaintiff in support of his motion for summary judgment as responded to by defendants (Doc. No. 73-2 ("PUF")), as well as the exhibits attached to the pending motions (Doc. Nos. 69-3, 71-3).

were employed by the SCSD and served as deputy sheriffs at the Main Jail during the relevant events.   (*Id.* at ¶¶ 6–10.)

Defendant Dr. Nugent served as the director of the SCSD's correctional health services ("CHS").  (PSUF ¶ 38.)   In his capacity as medical director, defendant Dr. Nugent was responsible for overseeing the delivery of medical services provided by the CHS, as well as the formulation of policies and procedures and utilization review.  (PSUF ¶ 39; *see also* Doc. No. 69-3 at 294.)  The CHS medical director reports to the chief of the CHS.  (Doc. No. 69-3 at 294.)  The parties dispute whether defendant Dr. Nugent had ultimate responsibility for medical care.  (PSUF ¶ 39.)

Defendant Nurse Gallagher, a registered nurse, held the position of administrative case manager at the case management unit ("CMU") of the Main Jail.  (DUF ¶¶ 49, 51; PUF ¶ 24.)  During the events relevant to this case, she was not acting as a nurse or providing medical advice; her responsibilities primarily pertained to administrative duties.  (DUF ¶ 52.)  Her job duties included making appointments with outside facilities for medical evaluations.  (DUF ¶ 49; PUF ¶ 24.)  She is not an orthopedic expert, and she did not have medical knowledge about when a heel bone begins to heal.  (DUF ¶ 53.)

**B.     Plaintiff's Arrest and Initial Injury**

On July 12, 2016, plaintiff was arrested for the unauthorized use of utility services and booked into the County's Main Jail.  (DUF ¶ 1.)  On July 29, 2016, plaintiff was transferred to RCCC.  (DUF ¶ 2.)  On August 29, 2016, while in custody at RCCC, plaintiff sustained a fracture to his right calcaneal bone.  (DUF ¶¶ 2–4.)[3]

**C.     Medical Timeline**

On August 30, 2016, plaintiff was transferred to the medical housing unit ("MHU").  (DUF ¶ 7.)  Between August 30 and September 2, 2016, plaintiff was repeatedly examined by

---

[3]  In plaintiff's statement of undisputed facts, plaintiff lists as undisputed that "[o]n August 31, 2016, plaintiff fractured his right calcaneal bone."  (PUF ¶ 1.)  However, the date "August 31, 2016" appears to be a typo, as the parties elsewhere agree that plaintiff injured himself on August 29, 2016, a date which is also reflected in plaintiff's medical records.  (DUF ¶¶ 2–4; Doc. No. 69-3 at 290.)

medical staff and orthopedic doctors, and x-rays were taken which documented the fracture to his right calcaneal bone.  (DUF ¶ 8; PUF ¶ 2; PSUF ¶ 2.)  On August 31, 2016, plaintiff was issued crutches and placed into a cast for his injury.  (Doc. No. 69-3 at 287; *see also* DUF ¶ 9.)

On September 2, 2016, plaintiff met with orthopedist Dr. Arnoldas Kungys.  (DUF ¶ 10; PUF ¶ 3; PSUF ¶ 3.)  Dr. Kungys considered plaintiff's fracture to be a significant injury.  (PUF ¶ 6; PSUF ¶ 6.)  Dr. Kungys recommended surgical evaluation for an open reductional internal fixation ("ORIF") of the calcaneus, along with splinting and elevation, and he explained to plaintiff why the surgery needed to be performed within about two weeks.  (PUF ¶ 3; PSUF ¶ 3.)  Plaintiff testified at his deposition that during the September 2, 2016 meeting, Dr. Kungys informed plaintiff that he required surgery within seven to ten days, and that without the surgery, the bone would start healing, making a subsequent ORIF surgery impossible.  (Doc. No. 71-3 at 69–70.)

That same day, on September 2, 2016, Dr. Nageswaran, a CHS medical doctor, prepared an outside orthopedic referral with Dr. Kungys's handwritten notes, a referral which "is believed to have been sent to [defendant Nurse] Gallagher."[4]  (DUF ¶ 10.)

On September 12, 2016, Dr. Janet Abshire, a CHS medical doctor, examined plaintiff and entered the following Subjective, Objective, Assessment and Plan "SOAP note" in plaintiff's medical record:

> S: Pt desires surgery as recommended.  He knows there is a window of opportunity to do this.  He states he did not refuse any visits . . . .
>
> O:  A&O, NAD, non icteric, in wheelchair and right LE in cast[;] Cor:  RRR, Lungs:  CTA bilat, Ext:  no edema
>
> A:  Frx right calcaneous [sic], intra articular and Left heel contusion s/p jumping backwards off bunk
>
> P:  CM referral written for ORIF as recommended Elavil 25 mg pm, SE advised

(PUF ¶ 10; PSUF ¶ 10.)  Additionally, in a "Consultation/ Case Management Request" dated September 12, 2016, Dr. Abshire wrote, "Outside ortho ORIF surgery recommended, ASAP,

---

[4]  The parties do not specify who it was that believed the outside orthopedic referral had been sent to Nurse Gallagher.

review timeframe of window with ortho."  (Doc. No. 71-3 at 581.)

On September 15, 2016, Dr. Lord, a CHS medical doctor, saw plaintiff and noted in plaintiff's medical record that Tylenol was not helping with the pain in plaintiff's foot, and Dr. Lord prescribed Naproxen for plaintiff.  (PUF ¶ 11.)

Defendant Nurse Gallagher could not recall plaintiff or when she first received the consultation note for plaintiff.  (DUF ¶ 41.)  On September 23, 2016, defendant Nurse Gallagher stated in plaintiff's medical record:  "Surgery Consult sent to outside provider for surgical evaluation.  Did not originally understand Dr. Abshire's consult request."  (Doc. No. 69-3 at 282; PUF ¶ 12; PSUF ¶ 12.)  According to defendants, this evidence demonstrates that on September 23, 2016, defendant Nurse Gallagher scheduled plaintiff's orthopedic surgical evaluation for a later date.  (DUF ¶¶ 47, 55.)  However, plaintiff disputes whether the surgical consult request was actually made on September 23, 2016, because defendant Nurse Gallagher testified that she could not find any record of when she made the referral.  (*Id.*)

On October 2, 2016, defendant Dr. Nugent wrote a "Consultation/Case Management Request" to defendant Nurse Gallagher noting that plaintiff had a calcaneal fracture.  (DUF ¶ 55; (Doc. No. 69-3 at 314.)  Specifically, defendant Dr. Nugent wrote the following to defendant Nurse Gallagher:

> Nancy, this inmate's calcaneal fracture has a Boehler angle I would estimate (due to the films being an ankle view rather than a calcaneal view) to be less than 5 degrees--normal is 20.  That is an essentially complete collapse of the calcaneus.  As part of his pre-op evaluation he needs a CT of the calcaneus.

(Doc. No. 69-3 at 314.)

On October 11, 2016, plaintiff was seen by Dr. John Casey, an outside orthopedic surgeon, at San Joaquin General Hospital.  (PUF ¶ 17.)  Plaintiff testified at his deposition that Dr. Casey told him that the ORIF surgery was no longer an option due to plaintiff's heal fracture being too far along in the healing process.  (Doc. No. 69-3 at 61–62.)  Dr. Casey testified at his deposition that ten to fourteen days is generally the optimal time to operate in such cases and that he would have liked to have seen plaintiff within two weeks of the injury.  (PUF ¶ 19; Doc. No. 71-3 at 547, 558.)

6

**D.       Consequences of Delayed ORIF Surgery Consultation Referral**

The parties' respective experts agree that ORIF surgery was the preferred medical treatment. (PUF ¶¶ 45, 60, 63.) Defense expert, Dr. Masoud Ghalambor, an orthopedic surgeon, testified at his deposition that plaintiff required an ORIF surgery and that the ideal time frame for this surgery is generally three to four weeks post-injury. (PUF ¶¶ 45, 46; Doc. No. 71-3 at 426, 430, 447.) He also testified that he concurred with Dr. Casey's opinion that by October 11, 2016, it was too late for ORIF surgery. (PUF ¶¶ 47, 49; Doc. No. 71-3 at 430.) Upon reviewing the January 2017 x-rays of plaintiff's calcaneal bone, Dr. Ghalambor noted malunion with a collapsed Böhler's angle, and upon examining the January 2020 x-rays of plaintiff, he observed an unchanged condition. (PUF ¶ 50; Doc. No. 71-3 at 450–51.) Dr. Ghalambor testified that ORIF surgery would have prevented a malunion. (Doc. No. 71-3 at 430–31.)

Plaintiff's orthopedic expert, Dr. Edward Younger, examined plaintiff in May 2021 and observed that plaintiff's ankle was stiff and restricted in side-to-side movement, up-and-down motion, and his heel was widened. (PUF ¶ 59.) Dr. Younger noted that plaintiff experienced moderate pain with pressure on the subtalar joint and had moderate decreased motion due to limited dorsiflexion and plantar flexion. (*Id.*) Dr. Younger found that plaintiff's surgery had been delayed beyond the time when ORIF surgery was possible. (PUF ¶ 60.) Dr. Younger opined that plaintiff should have been seen within one to two weeks from the date of injury. (*Id.*) He testified that, in his medical opinion, plaintiff would have been better off medically if he had received timely ORIF surgery. (PUF ¶ 63.)

**E.       The County's Medical Referral Practices for Pretrial Detainees**

In the County jails, if a doctor needed to refer a patient for outside care, the doctor would use a case management referral form to describe the medical need and the type of referral requested; the doctor would then send the referral form to defendant Nurse Gallagher in the

/////

/////

/////

/////

7

1  CMU.  (PSUF ¶ 41.)  It might take from a few days to a couple of weeks for defendant Nurse

2  Gallagher to receive the "consultation note."[5]  (DUF ¶ 45.)

3      According to defendant Nurse Gallagher's declaration, a consultation note with

4  handwritten physician notes is either scanned and uploaded to the patient's chart or faxed by a

5  medical assistant to defendant Nurse Gallagher.  (Doc. No. 69-3 at 360.)  Defendant Nurse

6  Gallagher also declared that if handwritten notes are present, the CMU generally receives the

7  consultation note later due to the scanning process.  (*Id.* at 360–61.)  Upon receipt of a

8  consultation request, Nurse Gallagher typically takes a week to compile the necessary medical

9  records, coordinate the appointment with the hospital, and dispatch the records to the outside

10  medical provider.  (DUF ¶ 46; PUF ¶ 26.)  She handles at least twenty outside referral requests

11  daily, including at least five orthopedic referral requests each week.  (DUF ¶ 44*; see also* PUF

12  ¶ 26.)

13      It is disputed between the parties how quickly an inmate can be seen by outside medical

14  doctors.  (PUF ¶ 18.)  Dr. Casey testified that urgent inmate cases, like emergency room visits,

15  could be arranged within a day or two.  (Doc. No. 71-3 at 557.)  Defendants argue that Dr.

16  Casey's testimony only pertains to emergency room evaluations, not to medical evaluation by a

17  specialist.  (PUF ¶ 18.)

18      Defendant Dr. Nugent testified that at the time of plaintiff's injury, the only firm contract

19  the County jails had was with the San Joaquin General Hospital, but the jails could not dictate the

20  terms of scheduling appointments there; instead, San Joaquin General Hospital set the schedule.

21  (Doc. No. 69-3 at 252.)  Furthermore, defendant Dr. Nugent testified that defendant Nurse

22  Gallagher was responsible for arranging appointments with the San Joaquin General Hospital and

23  that if she encountered difficulties, there was little he could do to intervene.  (Doc. No. 71-3 at

24  373, 382.)

25  /////

26  _____

27  [5]  In support of this fact, defendants cite the declaration of defendant Nurse Gallagher, which states, "The physician would write a consultation note requesting a patient been [sic] seen by a specialty doctor at an outside facility for further medical examination."  (DUF ¶ 45) (citing Doc.

28  No. 69-3 at 360).  Thus, it appears that the term "consultation note" is the referral form.

1  **F.    The County's Medical Referral Policies for Pretrial Detainees**

2          Defendant Sacramento County had multiple policies for the provision of medical care.

3  (DUF ¶ 105.)  However, none of those policies specifically refer to policies and procedures for

4  third-party medical referrals.  (*Id.*)

5          At his deposition, defendant Dr. Nugent testified that he was not aware of any CHS

6  policies regarding patient referrals for third-party orthopedic consults.  (PSUF ¶ 40; Doc. No. 71-

7  3 at 361.)  While he acknowledged administrative procedures and nursing protocols existed

8  regarding when a patient would be referred to a third-party provider, Dr. Nugent could not recall

9  their specifics.  (Doc. No. 71-3 at 361–62.)  He testified that he was not aware of any documents

10  outlining guidelines or policies for defendant Nurse Gallagher's work in finding outside providers

11  and making referrals to them.  (Doc. No. 71-3 at 361–62.)[6]  Defendant Dr. Nugent also testified

12  that he was now retired and, though working part-time for the County, no longer oversaw CHS.

13  (Doc. No. 71-3 at 352.)

14          Defendant Dr. Nugent also testified that certain records faced delays of up to a month

15  before being scanned into the patient's medical files, and at one point, CHS was thousands of

16  records behind, though he could not remember whether this occurred during the time period of

17  the events giving rise to this case.  (Doc. No. 71-3 at 397–98.)  Additionally, defendant Dr.

18  Nugent testified as follows:

19              [T]hese documents, these Case Management requests, are printed
               out, and they end up in this huge pile, and then they [CMU] go
20              through them.  It's a very inefficient method, in my opinion,
               unfortunately, because there is no staff there to do the work.  So it
21              might take some time for Nancy Gallagher to actually get to that
               record, okay, and actually see it.
22

23  (*Id.* at 401; PSUF ¶ 43.)  Furthermore, defendant Dr. Nugent acknowledged that there were

24  occasions where inmate patients were not timely referred for third-party medical care.  (Doc. No.

25  71-3 at 414–16.)

26  /////

27  _____

28  [6]  Defendants contend that defendant Dr. Nugent was not identified as the person most
    knowledgeable with respect to policies.  (PSUF ¶ 40.)

9

**G.      Plaintiff's Transfer to the Main Jail and Encounter with Defendant Dominguez**

A week after he suffered his heel injury, on the morning of September 6, 2016, plaintiff was transferred to the Main Jail.  (DUF ¶ 15.)  Defendant Dominguez met plaintiff in the Main Jail's booking area.  (DUF ¶ 19.)  Plaintiff testified that defendant Dominguez approached him and called him a "jihadist" for causing problems with the staff.  (*Id.*; *see also* Doc. No. 69-3 at 51.)  Plaintiff believes defendant Dominguez knew about plaintiff's need for immediate medical care because plaintiff was using crutches.  (DUF ¶ 40.)  At 7:00 a.m., defendant Dominguez placed plaintiff into an attorney-client holding room but did not allow plaintiff to bring his crutches into the holding cell, citing safety concerns that crutches could potentially be used as weapons.  (DUF ¶¶ 20, 21.)  As a result, plaintiff had to hop the last ten to fifteen feet to the holding cell.  (PSUF ¶ 72.)  At his deposition, defendant Dominguez testified that he would only remove crutches if placing a detainee in a cell with others, emphasizing that the safety concerns were applicable in such situations.  (Doc. No. 69-3 at 169.)  At his deposition, plaintiff recounted being informed by defendant Dominguez and others on different occasions that bringing crutches into a holding cell posed a security issue.  (*Id.* at 56.)  However, plaintiff expressed uncertainty as to whether removing crutches from inmates was an official policy, and he questioned the legitimacy of the explanation he was provided, remarking that he is "almost confident . . . they can say whatever they want to say, and you can't question it . . . ."  (*Id.* at 57.)

Between 8:00 a.m. and 9:00 a.m., while in a holding cell, plaintiff suffered a panic attack and hit the emergency call button.  (DUF ¶ 28.)  Pressing this button directly connects to central control, making the communication inaudible to floor deputies until they were standing next to the speaker.  (DUF ¶ 29.)  When the button is pressed, central control notifies a floor deputy using a landline or radio about a medical emergency.  (DUF ¶ 30.)  In this instance, defendant Dominguez arrived approximately five minutes after plaintiff pressed the emergency call button, and plaintiff reported to him that he was "not feeling well" and was experiencing "shortness of breath."  (DUF ¶ 31.)  Plaintiff testified that defendant Dominguez told him to stop hitting the emergency button and made threats about the consequences if he did so again.  (Doc. No. 69-3 at 57–59.)

In defendants' statement of undisputed facts and plaintiff's response thereto, both parties agree that at 9:11 a.m. that same day, two nurses examined plaintiff. (DUF ¶ 35.) However, plaintiff's separate statement of undisputed facts appears to indicate a dispute regarding the precise timing of the medical examination of him that day. (PSUF ¶ 73.) Specifically, plaintiff points to his deposition testimony that he did not recall being seen by a nurse in the morning but was first attended to by medical staff around 3:00 p.m. (Doc. No. 71-3 at 95–98.) Plaintiff testified that the nurses told him that they had attempted to check on him earlier but were informed that he was okay and did not seek assistance. (*Id.*) The parties agree that at 2:40 p.m., plaintiff was moved to the MHU and underwent an examination, which included a baseline EKG and cardiac evaluation. (DUF ¶ 38.) Though plaintiff reported agitation and stress, no cardiac issues were discovered. (*Id.*)

**H.      Plaintiff's Transfer to General Population and Encounter with Defendant Yang**

On February 6, 2017, plaintiff was transferred to 6 East general population and assigned to an upper-tier cell with a lower bunk. (DUF ¶ 67.) Lower-tier and lower-bunk assignments are decided only by medical staff or a physician. (DUF ¶ 69.) The parties dispute when plaintiff received a chrono for a lower-tier lower bunk.[7] Defendants assert that plaintiff received the chrono after a medical appointment on February 8, 2017, while plaintiff asserts that he had received the chrono earlier. (DUF ¶ 70.) Specifically, plaintiff testified that he gave defendant Yang a chrono for a lower-tier housing unit on February 6, 2017, but that defendant Yang nonetheless assigned him an upper tier. (No. 69-3 at 69–70.)

Plaintiff testified that he believed the chrono he gave to defendant Yang on February 6, 2017 also provided that he receive an extra blanket or two to elevate his injured foot. (Doc. No. 69-3 at 70.) Plaintiff testified that he did not bring his blankets from the MHU to 6 East, as inmates were typically issued new blankets upon arriving at their next housing unit. (Doc. No. 69-3 at 71.) When plaintiff asked for blankets, defendant Yang told him to shave his beard if he

---

[7]   According to the declaration of defendant Dr. Nugent, a "medical chrono" is also known as "[m]iscellaneous [m]edical [n]eeds documentation" and can only be provided by a medical doctor. (Doc. No. 69-3 at 356.)

wanted blankets.  (DUF ¶ 72.)  Opting not to shave, plaintiff was then denied blankets by

defendant Yang.  (DUF ¶ 73; Doc. No. 69-3 at 73.)  Plaintiff testified that he hit the call button

from his cell multiple times, informing defendant Yang that the air conditioning was blasting and

requesting blankets.  (Doc. No. 69-3 at 73.)  However, defendant Yang informed plaintiff that no

blankets were available.  (*Id.*; DUF ¶ 74.)  Plaintiff did not receive blankets until the following

morning.  (DUF ¶ 74.)

**I.       Plaintiff's Fall and Encounter with Defendant Meier**

On February 8, 2017, plaintiff left his upper tier housing pod.  (DUF ¶ 77.)  Plaintiff did

not take his medically issued cane as he descended the stairs.  (DUF ¶ 78.)  Plaintiff put weight

on his right foot, fell down the stairs, and did not move until a deputy arrived.  (DUF ¶ 79.)

Defendant Meier worked as the deputy responsible for bringing inmates to the medical

floor, providing security to the medical personnel during appointments, and bringing a wheelchair

when an inmate is on the ground.  (DUF ¶ 80.)  After plaintiff fell down the stairs on February 8,

2017, defendant Meier brought a wheelchair and escorted plaintiff to the MHU for a medical

examination.  (DUF ¶¶ 79, 81.)  Plaintiff met with Dr. Henderson and requested a wheelchair and

MHU housing, but Dr. Henderson denied those requests.  (DUF ¶ 83.)  Decisions as to the

providing of wheelchairs are made by medical staff, not deputies.  (DUF ¶ 66.)  If an inmate

requires a wheelchair after their medical appointment, they will be reassigned to the MHU with a

wheelchair, and if the inmate is deemed fit to return to custody, they will return to their prior

housing assignment without a wheelchair.  (DUF ¶ 85.)  Dr. Henderson cleared plaintiff for

custody and directed him to return to his housing unit.  (DUF ¶ 89.)  After leaving his

appointment with Dr. Henderson on February 8, 2017, plaintiff requested that defendant Meier

provide him with a wheelchair, and defendant Meier declined, telling plaintiff it was a doctor's

medical decision, not his decision to make.  (DUF ¶ 86.)  Plaintiff then hopped and crawled thirty

feet to the elevator to return to 6 East.  (DUF ¶ 90.)

Plaintiff did not speak with defendant Meier about having a broken heal bone or surgery

on his foot.  (DUF ¶¶ 91, 92.)  Plaintiff believes that defendant Meier had knowledge about

plaintiff's injury because defendant Meier saw plaintiff use a wheelchair between September

1  2016 and February 2017 while plaintiff was in the MHU.  (DUF ¶ 94.)

2  **J.      Plaintiff's Encounter with Defendant Grout**

3  Also on February 8, 2017, defendant Grout, co-officer in charge of 6 East, initially

4  instructed plaintiff to return to his upper tier cell after plaintiff returned from his medical visit.

5  (DUF ¶ 95; PSUF ¶ 76.)  However, approximately forty-five minutes after plaintiff's medical

6  visit, plaintiff was reassigned to a lower-tier housing unit.  (DUF ¶¶ 98, 99.)

7  **K.      Plaintiff's Release**

8  Plaintiff was released from custody on April 23, 2017, reporting no current injuries on his

9  release screening form.  (DUF ¶ 102.)

10  **LEGAL STANDARD**

11  Summary judgment is appropriate when the moving party "shows that there is no genuine

12  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

13  Civ. P. 56(a).

14  Each party's position, whether it be that a fact is disputed or undisputed, must be

15  supported by (1) "citing to particular parts of materials in the record, including depositions,

16  documents, electronically stored information, affidavits or declarations, stipulations (including

17  those made for purposes of the motion only), admissions, interrogatory answers, or other

18  materials"; or (2) showing that such materials "do not establish the absence or presence of a

19  genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

20  Fed. R. Civ. P. 56(c)(1)(A), (B).   The court may consider other materials in the record, even if

21  not cited by the parties, but it is not required to do so.  Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F.*

22  *Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

23  When resolving cross-motions for summary judgment, the court has an "independent duty

24  to review each cross-motion and its supporting evidence . . .  to determine whether that evidence

25  demonstrates a genuine issue of material fact."  *Fair Hous. Council of Riverside Cnty., Inc. v.*

26  *Riverside Two*, 249 F.3d 1132, 1137 (9th Cir. 2001).  Therefore, each motion is evaluated

27  separately, "giving the nonmoving party in each instance the benefit of all reasonable inferences."

28  *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016) (citation omitted).  If the

1   moving party will bear the burden of proof on an issue at trial, "the movant must affirmatively

2   demonstrate that no reasonable trier of fact could find other than for the moving party."

3   *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  However, when the non-

4   moving party will bear the burden of proof on an issue, "the movant can prevail merely by

5   pointing out that there is an absence of evidence to support the nonmoving party's case."  *Id.*; *see*

6   *also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (stating that when the non-

7   moving party bears the burden of proof at trial, "the moving party need only prove that there is an

8   absence of evidence to support the non-moving party's case") (citing *Celotex Corp. v. Catrett*,

9   477 U.S. 317, 325 (1986)); Fed. R. Civ. P. 56(c)(1)(B).  Indeed, after adequate time for discovery

10  and upon motion, summary judgment should be entered against a party who fails to make a

11  showing sufficient to establish the existence of an element essential to that party's case and on

12  which that party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A]

13  complete failure of proof concerning an essential element of the nonmoving party's case

14  necessarily renders all other facts immaterial."  *Id.* at 322–23.  In such a circumstance, summary

15  judgment should be granted, "so long as whatever is before the district court demonstrates that the

16  standard for the entry of summary judgment . . . is satisfied."  *Id.* at 323.

17        If the moving party meets its initial responsibility, the burden then shifts to the opposing

18  party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

19  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

20  existence of this factual dispute, the opposing party may not rely upon the allegations or denials

21  of its pleadings but is required to tender evidence of specific facts in the form of affidavits or

22  admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

23  P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

24  (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

25  summary judgment.").  The opposing party must demonstrate that the fact in contention is

26  material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the

27  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

28  non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 586–87 (citations omitted).

## ANALYSIS

**A.     Deliberate Indifference Claims Brought Against the Individual Defendants in their Individual Capacities**

In his operative TAC, plaintiff asserts two § 1983 claims against certain defendants in their individual capacities for deliberate indifference to his serious medical needs.  (Doc. No. 40.)  More specifically, plaintiff's second cause of action pertains to actions purportedly taken by the deputy defendants within the Main Jail housing units.  Plaintiff's fifth cause of action is brought against defendant Nurse Gallagher for alleged delays in scheduling an orthopedic surgery consultation for plaintiff's calcaneal fracture.

/////

/////

/////

15

Defendants move for summary judgment in their favor on plaintiff's second claim brought against the deputy defendants.[8]  (Doc. No. 69-1 at 21.)  Plaintiff does not move for summary judgment on this claim against the deputy defendants, taking the position that there are disputed material facts that a jury will be required to decide.  (Doc. No. 74 at 5.)  However, plaintiff and defendants have both moved for summary judgment in their favor as to plaintiff's fifth claim brought against defendant Nurse Gallagher seeking individual liability for deliberate indifference to plaintiff's medical needs.  (Doc. Nos. 69-1 at 25; 71-1 at 14.)

Defendants move for summary judgment in their favor as to plaintiff's § 1983 claims brought against defendants in their individual capacities on two grounds.  First, defendants contend that plaintiff cannot sustain his burden of establishing that defendants acted with deliberate indifference.  (Doc. No. 69-1 at 9–10, 21–23, 25–26.)  Second, defendants argue that they are entitled to qualified immunity.  (*Id.* at 10, 30–33.)  Because defendants' argument that the individual defendants were not deliberately indifferent is part of the qualified immunity

---

[8]  In his TAC, plaintiff alleges in his second cause of action for deliberate indifference that,

> [d]efendants Dominguez, Yang, Meier, and Grout were aware of plaintiff's medical problem and his need for timely surgery for plaintiff's calcaneal bone (right foot).  However, they:  (a) denied plaintiff the use of a wheelchair; (b) forced plaintiff to walk excessive distances on crutches or with a cane; (c) forced plaintiff to crawl on the ground; (d) denied plaintiff the use of shower and bathroom facilities for handicapped persons; (e) denied plaintiff a bunk in a medical unit; (f) denied plaintiff a bunk on a ground floor; (g) denied plaintiff a bunk on the lower tier of a double bunk; and [h] forced plaintiff to use stairways when it was medically inappropriate and unnecessarily arduous and painful for him.

(Doc. No. 40 at ¶ 72.)  In addition, it appears that plaintiff also bases his deliberate indifference claim against defendant Dominguez on the following three additional incidents that allegedly occurred on September 6, 2016:  telling plaintiff, "you're the jihadist I've been hearing about giving my partners a hard time at RCCC"; taking away plaintiff's medically issued crutches; and interfering with plaintiff receiving medical care for his complaints of chest pain.  (*Id.* at ¶¶ 36–37.)  The deputy defendants do not seek summary judgment in their favor to the extent that plaintiff's deliberate indifference claim is predicated on his allegations that the deputy defendants "(b) forced plaintiff to walk excessive distances on crutches or with a cane"; "(d) denied plaintiff the use of shower and bathroom facilities for handicapped persons"; and "(e) denied plaintiff a bunk in a medical unit[.]"  (*See id.*)  Below, with regard to each deputy defendant, the court will specify the factual predicates addressed in the defendants' motion for summary judgment.

1   analysis, the court will address both arguments together below.

2         Under § 1983, a private right of action exists against anyone who, "under color of" state

3   law, causes a person to be subjected "to the deprivation of any rights, privileges, or immunities

4   secured by the Constitution and laws . . . ."  42 U.S.C. § 1983.  "Section 1983 does not create

5   substantive rights; it merely serves as the procedural device for enforcing substantive provisions

6   of the Constitution and federal statutes."  *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991)

7   (citing *Chapman v. Hous. Welfare Rts. Org.*, 441 U.S. 600, 617 (1979)).  State officials are

8   entitled to qualified immunity from a § 1983 suit unless "(1) they violated a federal statutory or

9   constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the

10   time.'"  *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards*,

11   566 U.S. 658, 664 (2012)).

12         Plaintiff's deliberate indifference claims are based on his status as a pretrial detainee

13   within the County's jails after being arrested for the unauthorized use of utility services.

14   Accordingly, the Fourteenth Amendment Due Process Clause applies to these claims, rather than

15   the Eighth Amendment's Cruel and Unusual Punishment Clause.  *See Gordon v. Cnty. of Orange*,

16   888 F.3d 1118, 1124 (9th Cir. 2018) ("[H]ere, the medical care claims brought by pretrial

17   detainees also 'arise under the Fourteenth Amendment's Due Process Clause, rather than under

18   the Eighth Amendment's Cruel and Unusual Punishment Clause[.]'") (citation omitted).

19         To prevail on a deliberate indifference claim under the Due Process Clause of the

20   Fourteenth Amendment, a plaintiff must establish the following elements:

21
22            (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

23

24

25

26   *Gordon*, 888 F.3d at 1125.  The defendant's conduct under the third element "must be objectively

27   unreasonable, a test that will necessarily turn on the facts and circumstances of each particular

28   case."  *Id.* (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)) (internal

1   alterations and quotation marks omitted).  "An *inadvertent* failure to provide adequate medical

2   care does not, by itself, state a deliberate indifference claim for § 1983 purposes."  *Wilhelm v.*

3   *Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quotation marks and brackets omitted).  Instead, a

4   plaintiff is required to "prove more than negligence but less than subjective intent—something

5   akin to reckless disregard."  *Gordon*, 888 F.3d at 1125.

6          1.      Deliberate Indifference Claim Against Defendant Dominguez in His Individual

7                  Capacity

8          In moving for summary judgment in defendant Dominguez's favor as to plaintiff's

9   deliberate indifference claim, defendants addressed the evidence of several interactions between

10  plaintiff and defendant Dominguez on September 6, 2016, specifically that defendant Dominguez

11  called plaintiff a "jihadist," confiscated plaintiff's crutches when placing plaintiff into a holding

12  cell, and interfered with plaintiff receiving medical care when he had complained of chest pain.[9]

13  (Doc. No. 69-1 at 21–22.)

14         First, addressing the jihadist comment, defendants aptly assert that name-calling alone

15  does not constitute a constitutional violation.  (Doc. No. 69-1 at 22); *see also Oltarzewski v.*

16  *Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (holding that "[v]erbal harassment or abuse . . .  is

17  not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983") (citation omitted).

18  Thus, to the extent that plaintiff's deliberate indifference claim against defendant Dominguez is

19  based on the jihadist comment, defendants' motion for summary judgment in defendant

20  Dominguez's favor will be granted.

21         Second, it is undisputed that defendant Dominguez took away plaintiff's medically issued

22  crutches, requiring plaintiff to hop ten to fifteen feet to the holding cell and leaving him without

23  the crutches while in the holding cell.  Defendants argue that this action was motivated by

24  legitimate safety concerns regarding the potential use of crutches as a weapon and, as such,

25  confiscating plaintiff's crutches does not constitute a constitutional violation.  (Doc. No. 69-1 at

26  22.)  Yet, defendants do not cite any legal authority to support their assertion that a legitimate

27

28  ---
[9]  Defendants do not seek summary judgment in defendant Dominguez's favor based on the
    incidents alleged in paragraph 72 of plaintiff's TAC.

safety concern alone can defeat a Fourteenth Amendment claim at the summary judgment stage. While it is true that the Supreme Court has held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 78, 89 (1987), the Ninth Circuit has clarified that this *Turner* standard does not govern Eighth Amendment claims, which instead are evaluated under the "deliberate indifference" standard.  *See Grenning v. Miller-Stout*, 739 F.3d 1235, 1240 (9th Cir. 2014) ("The precise role of legitimate penological interests is not entirely clear in the context of an Eighth Amendment challenge to conditions of confinement.  The Supreme Court has written that the test of *Turner v. Safley* [], which requires only a reasonable relationship to a legitimate penological interest to justify prison regulations, does not apply to Eighth Amendment claims.").  While plaintiff's claims arise under the Fourteenth Amendment, not the Eighth Amendment, Ninth Circuit precedent requires that no distinction be made between pretrial detainees and prisoners in applying the *Turner* test.  *See Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 974 n.10 (9th Cir. 2010) ("We have never distinguished between pretrial detainees and prisoners in applying the *Turner* test[.]").  Moreover, pretrial detainees cannot be granted fewer or lesser constitutional rights than those enjoyed by convicted prisoners.  *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a person [in state custody] are at least as great as the Eighth Amendment protections available to a convicted prisoner.").  Consequently, the court finds defendants' generic assertion of a penological justification for confiscating plaintiff's crutches to be unpersuasive at the summary judgment stage of this litigation.  *See Grenning*, 739 F.3d at 1240 (noting that it is unclear whether it is "possible for a defendant to defeat an Eighth Amendment conditions of confinement claim at summary judgment by showing a legitimate penological interest").

Even if it were possible for defendants to defeat plaintiff's Fourteenth Amendment deliberate indifference claim at summary judgment by merely establishing the existence of a legitimate penological interest, defendants have failed to do so here.  Defendants support their argument that the removal of crutches from detainees while they are in holding cells serves a legitimate penological safety purpose by citing to the deposition testimony of both plaintiff and

1  defendant Dominguez.  (*See* DUF ¶ 27.)  At his deposition, plaintiff recounted being informed by

2  defendant Dominguez and others on different occasions that bringing crutches into a holding cell

3  posed a security issue.  (*See* Doc. No. 69-3 at 56.)  However, because plaintiff expressed

4  uncertainty about whether the removal of crutches from inmates entering holding cells is an

5  official policy, (*id.* at 57), plaintiff's deposition testimony does not furnish unequivocal evidence

6  supporting the notion that plaintiff being deprived of crutches was reasonably connected to

7  legitimate penological interests.

8         At his own deposition, defendant Dominguez testified that he would not confiscate

9  crutches if an inmate was placed in a holding cell alone.  (Doc. No. 69-3 at 169.)  However, there

10  is no evidence before the court on summary judgment establishing whether plaintiff was placed

11  into the holding cell with others or was the only one in the holding cell.  Consequently, there is no

12  indication that defendant Dominguez's rationale for confiscating plaintiff's crutches was pertinent

13  to plaintiff's specific circumstances.  *See Grenning*, 739 F.3d at 1241 (reversing the district

14  court's granting of summary judgment in the defendants' favor because there was a genuine

15  dispute of fact regarding whether the defendant officials were deliberately indifferent as to the

16  effect on the plaintiff of continuous lighting and stating that there was "no indication that

17  Defendants' proffered justifications for constant illumination were relevant to [the plaintiff]").

18  Therefore, to the extent that plaintiff's deliberate indifference claim brought against defendant

19  Dominguez is based on him taking away plaintiff's medically issued crutches, defendants' motion

20  for summary judgment in defendant Dominguez's favor will be denied.

21         Third, defendants contend that "plaintiff was seen at 9:11 a.m. [on September 6, 2016],

22  medically cleared, and transferred in the afternoon to the MHU for further cardiac evaluation

23  including an EKG examination" and that "plaintiff's chest pain complaints were not cardiac

24  issues but anxiety related."  (Doc. No. 69-1 at 23.)  However, whether plaintiff was seen by

25  medical personnel at 9:11 a.m. is disputed, as plaintiff testified that he was not seen until

26  midafternoon that day.  In addition, defendants argue that "[t]here is no evidence to suggest

27  Deputy Dominguez prohibited plaintiff from receiving medical attention."  (*Id.* at 24.)  Yet,

28  plaintiff has presented evidence to the contrary, specifically that defendant Dominguez warned

20

1    him not to touch the emergency button and that the nurses told plaintiff that they did not come to

2    his aid because they were told he was okay.  In sum, viewing the evidence before it on summary

3    judgment in the light most favorable to plaintiff, the court finds there is a genuine dispute of

4    material fact as to whether defendant Dominguez was deliberately indifferent to plaintiff's

5    medical needs with regard to his alleged interference with plaintiff receiving medical care for his

6    complaints of chest pain on September 6, 2016.

7          The court now turns to the second step of the qualified immunity analysis, asking whether

8    defendant Dominguez's conduct violated clearly established law at the relevant time.  *See Wesby*,

9    583 U.S. at 63.  In 2016, when the interactions between defendant Dominguez and plaintiff

10   occurred, legal precedent made "clear that prison officials violate the Constitution when they

11   'deny, delay or intentionally interfere' with needed medical treatment."  *Sandoval v. Cnty. of San*

12   *Diego*, 985 F.3d 657, 679 (9th Cir. 2021) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.

13   2006)).  For example, it was clearly established in *Frost v. Agnos*, 152 F.3d 1124 (9th Cir. 1998)

14   that a knowing failure to provide a disabled inmate with accommodations violates that inmate's

15   constitutional rights.  *See id.* at 1129; *see also Johnson v. Hardin Cnty.*, 908 F.2d 1280, 1284 (6th

16   Cir. 1990) (holding that a prison official's denial of crutches and access to shower facilities to a

17   prisoner with fractures to both legs was sufficient to amount to deliberate indifference to serious

18   medical needs); *Cummings v. Roberts*, 628 F.2d 1065, 1068 (8th Cir. 1980) (holding that the

19   denial of a wheelchair to a prisoner for three days and the deliberate interference with medical

20   treatment was sufficient for Eighth Amendment claim of cruel and unusual punishment); *Stevens*

21   *v. Jungen*, No. 3:11-cv-00558-LRH, 2014 WL 910390, at *12 (D. Nev. Mar. 6, 2014) ("When

22   viewing the facts in the light most favorable to plaintiff, [the defendant] refused to arrange a

23   wheelchair pusher for plaintiff in deliberate indifference to his serious medical needs.  The

24   general law concerning plaintiff's constitutional claims was clearly established at the time of the

25   events alleged in plaintiff's complaint.").  Furthermore, plaintiff's crutches were medically

26   issued, and it was clearly established that deputies at the jail are deliberately indifferent when

27   they "deliberately ignore[] the express orders of a prisoner's prior physician for reasons unrelated

28   to the medical needs of the prisoner."  *Jett*, 439 F.3d at 1097 (quoting *Hamilton v. Endell*, 981

F.2d 1062, 1065 (9th Cir. 1992), *abrogated in part on other grounds by Est. of Ford v. Ramirez–Palmer*, 301 F.3d 1043, 1045 (9th Cir. 2002)).  In light of this clearly established law at the time, the granting of summary judgment in defendant Dominguez's favor is not appropriate here because his entitlement to qualified immunity depends on disputed factual issues which must be resolved by the trier of fact.

Accordingly, the court will grant summary judgment in favor of defendant Dominguez as to plaintiff's deliberate indifference claim only to the extent that claim is predicated on defendant Dominguez's alleged "jihadist" comment directed to plaintiff.  Defendants' motion for summary judgment as to plaintiff's deliberate indifference claim brought against defendant Dominguez will otherwise be denied.

2.     Deliberate Indifference Claim Against Defendant Yang in His Individual Capacity

The parties dispute whether plaintiff had a valid chrono for a lower bunk lower tier and additional blankets when he arrived at 6 East general population on February 6, 2017.[10]

Viewing the evidence in the light most favorable to plaintiff, a jury could reasonably find that defendant Yang ignored the instructions of plaintiff's physicians for non-medical reasons when he assigned plaintiff to upper tier housing.  This dispute of fact is material because plaintiff's deliberate indifference claim hinges on whether defendant Yang should have reasonably known that plaintiff faced a substantial risk of serious harm by being assigned to an upper tier and whether defendant Yang disregarded that risk by failing to take reasonable measures to abate it.

Furthermore, if defendant Yang was aware from the chrono note that plaintiff required blankets due to the cold cell environment and plaintiff's specific need for additional blankets to elevate his leg, the failure to provide blankets would demonstrate deliberate indifference.  *See Saenz v. Reeves*, No. 1:09-cv-00557-BAM, 2012 WL 4049975, at *15 (E.D. Cal. Sept. 13, 2012) ("[I]f [the defendant] knew that Plaintiff was in need of additional clothing and blankets due to the cell being bitterly cold, regardless of whether there was medical documentation, the failure to

---

[10]  Though not explicit, plaintiff appears to argue that he would not have fallen down the stairs had defendant Yang not assigned him to an upper tier.  (Doc. No. 74 at 27.)

1   provide adequate clothing and blankets would exhibit deliberate indifference.  Material issues of

2   fact exist, and [the defendant] is not entitled to summary judgment on Plaintiff's claims that he

3   was denied blankets and warm clothing while housed in cell 159.").

4           The court now addresses the second step of the qualified immunity analysis:  whether,

5   when viewing the facts in the light most favorable to plaintiff, defendant Yang's conduct violated

6   clearly established law at the time these incidents allegedly took place.  *See Wesby*, 583 U.S. at

7   63.  In 2017, at the time of the interaction between defendant Yang and plaintiff, Ninth Circuit

8   precedent clearly established that a jail deputy must furnish a lower bunk bed assignment to an

9   inmate whose need for such is based on medical necessity.  Specifically, the Ninth Circuit, in its

10  decision in *Akhtar v. Mesa*, 698 F.3d 1202, 1213–14 (9th Cir. 2012), determined that a prison

11  official's failure to comply with an inmate's medical chrono requiring a bottom bunk can

12  constitute deliberate indifference.  In that case, an inmate with serious medical conditions

13  presented a medical accommodation chrono specifying the need for him to be assigned to a

14  bottom bunk.  *Id.*  Despite showing the medical chrono to prison officials, the officials

15  disregarded it and assigned the inmate to a top bunk, from which he fell and broke his wrist.  *Id.*

16  at 1206.

17          In addition, it was clearly established in 2017 that jail deputies have a duty to ensure that

18  pretrial detainees are provided with adequate bedding and that the denial of such necessities is

19  sufficiently serious to violate the Fourteenth Amendment.  *See Wilson v. Seiter*, 501 U.S. 294,

20  304 (1991) (stating that the Eighth Amendment can be violated by low cell temperatures at night

21  without blankets being issued); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir.

22  1989) (holding that denying a mattress or bed for two nights violated the Fourteenth Amendment

23  rights of a pretrial detainee), *overruled on other grounds by Bull v. City & Cnty. of San

24  Francisco*, 595 F.3d 964 (9th Cir. 2010); *Davison v. Carona*, No. 06-cv-01258-VAP-CW, 2010

25  WL 4345752, at *13 (C.D. Cal. Sept. 29, 2010) (finding that at summary judgment the defendants

26  had not established their qualified immunity defense, stating, "the law on Fourteenth Amendment

27  due process rights regarding punitive conditions of confinement for non-criminal detainees, as

28  discussed above, was clearly established at the time in question, and at least some of the actions

1    ascribed to Defendants clearly violated these rights, such as denying a detainee warm bedding in

2    a cold cell"), *report and recommendation adopted*, 2010 WL 4338391 (C.D. Cal. Oct. 26, 2010);

3    *see also Johnson*, 908 F.2d at 1284 (finding that a genuine dispute of fact as to whether the

4    defendants failed to provide pain medication, crutches, and bedding to inmate with compound

5    foot fractures precluded the granting of summary judgment for the defendants on the inmate's

6    deliberate indifference claim); *Saenz*, 2012 WL 4049975, at \*15, \*17 (holding that the defendant

7    was not entitled to summary judgment or qualified immunity under the Eighth Amendment,

8    where defendant denied the plaintiff's requests for blankets and clothing in a bitterly cold cell).

9          In light of the cited precedents, the court concludes that defendant Yang has not

10    established his entitlement to summary judgment on qualified immunity grounds.  Accordingly,

11    defendants' motion for summary judgment in defendant Yang's favor as to plaintiff's deliberate

12    indifference claim will be denied.

13          3.     <u>Deliberate Indifference Claim Against Defendant Meier in His Individual Capacity</u>

14          In their motion for summary judgment, defendants argue that defendant Meier's decision

15    to refuse to provide plaintiff with a wheelchair after plaintiff's visit with Dr. Henderson was

16    justified because Dr. Henderson had concluded that plaintiff did not require a wheelchair.  (Doc.

17    No. 69-1 at 23.)  The court finds this argument persuasive.  Plaintiff lacks medical expertise, *see*

18    Fed. R. Evid. 701, 702, and on summary judgment he has offered only his own belief that he

19    should have received a wheelchair.  Yet, a patient's difference of opinion regarding the

20    appropriate course of medical treatment does not meet the threshold for deliberate indifference.

21    *See Hernandez v. Marcelo*, No. 1:19-cv-01219-JLT-CDB, 2023 WL 4710894, at \*19 (E.D. Cal.

22    July 24, 2023) ("Plaintiff is not medically trained.  He simply offers his opinion that he was

23    entitled to a wheelchair when he was seen by [the defendant].  However, a patient's difference of

24    medical opinion concerning the appropriate course of treatment is not sufficient to constitute

25    deliberate indifference."), *report and recommendation adopted*, No. 1:19-cv-01219-JLT-CDB,

26    2023 WL 6796750 (E.D. Cal. Oct. 13, 2023) (internal citation omitted).

27          The evidence presented by plaintiff on summary judgment would not permit a reasonable

28    jury to conclude that a constitutional violation took place in this regard.  Thus, the court will grant

1  defendants' motion for summary judgment in favor of defendant Meier on plaintiff's deliberate

2  indifference claim against him to the extent that claim is predicated on defendant Meier's denying

3  plaintiff a wheelchair.

4        4.       Deliberate Indifference Claim Against Defendant Grout in His Individual Capacity

5        In moving for summary judgment as to plaintiff's deliberate indifference claim against

6  defendant Grout, defendants argue that there is no admissible evidence sufficient to establish that

7  he engaged in any conduct that rises to the level of deliberate indifference.  (Doc. No. 69-1 at 23.)

8  Specifically, defendants highlight that shortly after plaintiff asked defendant Grout for a lower

9  tier assignment, plaintiff was moved to the lower tier.  (*Id.*)  Defendants' arguments in this regard

10  are persuasive, given that "a *de minimis* level of imposition" does not invoke due process

11  protections.  *Bell v. Wolfish*, 441 U.S. 520, 539 n.21 (1979).  Furthermore, "short delays in

12  providing care are often not actionable."  *Perez v. Brady*, No. 2:19-cv-04309-VBF-KES, 2020

13  WL 2441434, at *5 (C.D. Cal. Mar. 16, 2020), *report and recommendation adopted*, No. 2:19-cv-

14  04309-VBF-KES, 2020 WL 2441434 (C.D. Cal. May 12, 2020).

15        Here, the evidence on summary judgment establishes that on February 8, 2017, defendant

16  Grout initially instructed plaintiff to return to his upper cell after returning from his medical visit.

17  However, approximately forty-five minutes after the conclusion of the medical visit, plaintiff was

18  reassigned to a lower-tier housing unit.  Plaintiff has not come forward with any evidence that he

19  suffered any harm from this forty-five-minute delay in his reassignment.  He has thus failed to

20  raise a genuine issue of material fact as to whether defendant Grout's conduct constitutes

21  deliberate indifference.

22        Based on defendant Grout's initial denial of plaintiff's bunk reassignment, plaintiff has

23  not put forth evidence establishing a genuine issue of material fact as to an underlying

24  constitutional violation.  Accordingly, the court will grant defendants' motion for summary

25  judgment as to plaintiff's deliberate indifference claim against defendant Grout to the extent that

26  it is based on Grout's initial, short-lived, denial of plaintiff's bunk reassignment request.

27  /////

28  /////

25

1        5.      Deliberate Indifference Claim Against Defendant Nurse Gallagher in Her

2                Individual Capacity

3        As discussed above, defendants and plaintiff have cross moved for summary judgment on

4  plaintiff's fifth claim brought against defendant Nurse Gallagher for deliberate indifference in her

5  individual capacity.  (Doc. Nos. 69-1 at 25; 71-1 at 14.)

6        In their motion for summary judgment, defendants argue that defendant Nurse Gallagher

7  did not have any knowledge that plaintiff's fractured heel needed to be treated within a short time

8  window, and therefore, that she was not deliberately indifferent towards that medical need.  (Doc.

9  No. 69-1 at 9.)  However, defendants' argument in this regard is unavailing because, as plaintiff

10  points out in his own motion for summary judgment[11] and in his opposition to defendants'

11  motion, an objective standard applies to constitutional claims of inadequate medical care brought

12  by pretrial detainees.  (Doc. Nos. 71-1 at 15–17; 74 at 21–22); *see Gordon*, 888 F.3d at 1124–25

13  (recognizing that "the plaintiff must prove more than negligence but less than subjective intent—

14  something akin to reckless disregard").  Thus, the critical question is not whether defendant Nurse

15  Gallagher had subjective knowledge of plaintiff's need to be treated promptly, but rather whether

16  defendant Nurse Gallagher "did not take reasonable available measures to abate a risk, even

17  though a reasonable official in the circumstances would have appreciated the high degree of risk

18  involved."  *Gordon*, 888 F.3d at 1125.

19

---

20  [11]  In his motion for summary judgment, plaintiff states he became aware during the deposition of the defendants' expert that he could have undergone another surgical procedure, known as a

21  subtalar fusion, in mid-January 2017, while still in custody.  (Doc. No. 71-1 at 5.)  Plaintiff filed a motion for leave to file a fourth amended complaint to incorporate the alleged failure to provide

22  him a subtalar fusion as a second instance of wrongful conduct, aiming to introduce a new theory of liability under both his deliberate indifference and medical malpractice claims against

23  defendants Nurse Gallagher and Dr. Nugent.  (Doc. No. 70.)  However, the undersigned subsequently denied plaintiff's motion for leave to file a fourth amended complaint.  (*See* Doc.

24  No. 96.)  In this same vein, the court will not consider the subtalar fusion evidence plaintiff submitted on summary judgment for the purposes of establishing a predicate act with respect to

25  his deliberate indifference and medical malpractice claims.  While the court could consider such evidence when evaluating plaintiff's *Monell* claim—specifically, in determining whether there is

26  evidence of a pattern of similar constitutional violations—there is already sufficient evidence to establish a genuine dispute of material fact as to that claim.  Therefore, the court will not consider

27  plaintiff's subtalar fusion related evidence in resolving the pending motion.

28

1     Construing the facts in the light most favorable to plaintiff, and applying the *Gordon*

2 framework, a jury could conclude from the evidence before the court that defendant Nurse

3 Gallagher did not take reasonable available measures to ensure a timely a ORIF surgical

4 consultation, for example, by moving up plaintiff's appointment with the outside orthopedic

5 surgeon Dr. Casey.  Furthermore, a jury could conclude from the evidence that a reasonable nurse

6 who routinely handles orthopedic referrals and who had received multiple consultation requests

7 for the plaintiff would have understood that plaintiff faced a "substantial risk of suffering serious

8 harm" if he did not have an ORIF surgery within a short window of time from his injury.  *See id.*

9 In other words, plaintiff has raised a genuine dispute as to whether defendant Nurse Gallagher

10 acted with deliberate indifference.

11     As discussed above, well before the alleged deliberate indifference took place in this case,

12 the Ninth Circuit decided that delaying necessary medical care due to administrative reasons

13 "unrelated to the medical needs of the prisoner" is akin to deliberate indifference.  *See Jett*, 439

14 F.3d at 1097.  More specifically, it was clearly established long before plaintiff's injury occurred

15 that prison officials who deliberately ignored the express orders of a prisoner's physician for

16 reasons unrelated to the medical needs of the prisoner violated that prisoner's constitutional

17 rights.  *See id.*; *see also Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 408 (9th

18 Cir. 1985) (reversing and remanding for consideration of the plaintiff's deliberate indifference

19 claim and stating that "[i]f it is true that prison officials denied [the prisoner's] surgery despite the

20 *repeated* recommendations of [his] physicians, [he] may well have a valid section 1983

21 action[.]"); *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) ("[W]e have held that a

22 prison official acts with deliberate indifference when he ignores the instructions of the prisoner's

23 treating physician or surgeon.").  As a result, when viewing the evidence in the light most

24 favorable to plaintiff, defendant Nurse Gallagher has not established her entitlement to summary

25 judgment on qualified immunity grounds as to plaintiff's deliberate indifference brought claim

26 against her in her individual capacity.

27     On the other hand, construing the facts in the light most favorable to defendant Nurse

28 Gallagher, a reasonable jury could find that she did not act with deliberate indifference.

Specifically, although the doctor's consultation notes indicated urgency, they did not specifically state how quickly the ORIF surgery needed to be performed on plaintiff.  Therefore, there exists a genuine dispute as to whether defendant Nurse Gallagher "did not take reasonable available measures to abate" the risk of plaintiff suffering serious harm, "even though a reasonable official in the circumstances would have appreciated the high degree of risk involved."  *See Gordon*, 888 F.3d at 1125.

Because there are genuine disputes of material fact, the court will deny the cross-motions for summary judgment with respect to plaintiff's deliberate indifference claim brought against defendant Nurse Gallagher in her individual capacity.

**B.     Deliberate Indifference Claims Against Defendants Nurse Gallagher and Dr. Nugent in their Supervisory Capacities**

As noted above, plaintiff asserts his fourth claim of supervisory liability against defendants Nurse Gallagher and Dr. Nugent based on their alleged failure to provide him a timely referral to an outside orthopedist, and both plaintiff and defendants have moved for summary judgment in their favor as to this claim.  (Doc. Nos. 40 at 29; 69-1 at 24; 71-1 at 18.)

"A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  In addition, supervisory liability exists "if supervisory officials implement a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is the moving 'force of the constitutional violation.'" *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (quoting *Thompkins v. Belt*, 828 F.2d 298, 303–04 (5th Cir. 1987)).

In his motion for summary judgment, plaintiff argues that defendant Nurse Gallagher, as the head of the CMU, was a supervisor with direct responsibility for plaintiff's medical care. (Doc. No. 71-1 at 18.)  However, plaintiff's claim is not based on any purported actions by any subordinates of defendant Nurse Gallagher for which she could be held liable.  Because plaintiff is challenging the conduct of defendant Nurse Gallagher directly and not the conduct of her subordinates, the claim against her in supposed supervisory capacity fails as a matter of law.  *See*

28

1   *Taylor*, 880 F.2d at 1045.  Accordingly, defendants' motion will be granted as to plaintiff's fourth

2   claim against defendant Nurse Gallagher, and plaintiff's motion for summary judgment in his

3   favor on this claim against defendant Nurse Gallagher will be denied.

4          As to defendant Dr. Nugent, it is undisputed that he was responsible for policies,

5   procedure, and utilization review, and he was the medical director responsible for overseeing

6   medical services.  Because, as explained above, the court is denying summary judgment on

7   plaintiff's deliberate indifference claim brought against defendant Nurse Gallagher in her

8   individual capacity due to the existence of genuine disputes of material fact, the court will

9   likewise deny both parties' motions for summary judgment on plaintiff's claim seeking to hold

10  defendant Dr. Nugent liable in his supervisory capacity for defendant Nurse Gallagher's alleged

11  deliberate indifference.

12  **C.     Municipal Liability**

13         Both defendants and plaintiff have also moved for summary judgment in their favor

14  regarding plaintiff's *Monell*[12] claim brought against the County.  (Doc. Nos. 69-1 at 17; 71-1 at

15  22.)

16         To prevail on a claim under *Monell*, the plaintiff must ultimately show:  "(1) that [the

17  plaintiff] possessed a constitutional right of which [he] was deprived; (2) that the municipality

18  had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional

19  right; and, (4) that the policy is the moving force behind the constitutional violation."  *Dougherty*

20  *v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (citation omitted).  The plaintiff must

21  demonstrate that this policy or custom "reflects deliberate indifference to the constitutional rights

22  of [the municipality's] inhabitants," and there must be a "direct causal link between a municipal

23  policy or custom and the alleged constitutional deprivation."  *Castro*, 833 F.3d at 1073, 1075

24  (quoting *City of Canton v. Harris*, 489 U.S. 378, 385, 392 (1989)).  The Ninth Circuit recognizes

25  four theories of *Monell* liability based upon:  (1) an official policy; (2) ratification by a final

26  policymaker; (3) a failure to train, supervise, or discipline; or (4) a pervasive custom or practice.

27  _____

28  [12]  *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

1    *See Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

2            The Supreme Court has held that "a plaintiff may be able to prove the existence of a

3    widespread practice that, although not authorized by written law or express municipal policy, is

4    'so permanent and well settled as to constitute a "custom or usage" with the force of law.'"  *City*

5    *of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (citation omitted).  However, a few "isolated

6    or sporadic incidents" are not sufficient to prove that a city has an unconstitutional custom or

7    practice.  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified by Navarro v.*

8    *Block*, 250 F.3d 729 (9th Cir. 2001).  A practice or custom must have "sufficient duration,

9    frequency and consistency" that it has "become a traditional method of carrying out policy."  *Id.*

10   A "policy of inaction" can amount to an unconstitutional policy.  *See Connick v. Thompson*, 563

11   U.S. 51, 61 (2011).  The pattern of incidents must reflect "similar constitutional violations."  *Id.*

12   at 62.

13           Both parties have presented evidence supporting their respective positions regarding the

14   County's custom or policy of sending untimely referrals for inmates to receive outside medical

15   care.  Plaintiff has pointed to a pattern of similar constitutional violations reflecting deliberate

16   indifference to serious medical needs through delayed referrals, while defendants have pointed to

17   evidence that the County has multiple policies and procedures in place to provide timely medical

18   services.  The precise question of whether the County maintains a custom or practice of delaying

19   the provision of orthopedic care in its jails was recently addressed by another judge of this district

20   court in an order ruling on a similar motion for summary judgment, and there, the question was

21   found not to be amenable to resolution on summary judgment because there were genuine factual

22   disputes.  *See Mollica*, 2023 WL 3481145, at *10.  Specifically, in *Mollica*, the court denied

23   defendants' motion for summary judgment in their favor as to plaintiff's *Monell* claims, stating:

24              Here, plaintiff has pointed to a pattern of similar constitutional
                violations reflecting deliberate indifference to medical needs through
25              delayed surgeries and orthopedic surgery consultations.  *See*
                *generally* Inmate Grievances (showing multiple grievances noting
26              delay in receiving orthopedic surgery and consultation).  Plaintiff
                also has provided a consent decree in which a court has ordered
27              defendants to provide constitutional medical care.  Consent Decree,
                Merin Decl. Ex. Q.  According to the second monitoring report
28              required by the consent decree, there was evidence that the

1
2
3
4
5
6
7

> Sacramento County Jail, including the Main Jail and RCCC, did not provide inmate patients timely access to care for serious medical needs. Monitoring Report at 494, Merin Decl. Ex. R. Among other things, the report found specialty care was "often delayed even when available in the local community." *Id.* at 515. The reported delays included when orthopedic surgery was required. *See id.* (providing example of patient who "saw an outside orthopedic surgeon" a month after her injury, despite having a "type of fracture [that] often requires surgical repair"). There is sufficient evidence supporting plaintiff's case such that there is a genuine dispute whether the County and Sheriff's Department maintain a custom or practice of delaying orthopedic care.

8

*Id.*

9       Similarly, here, the court finds based upon the evidence before it that a genuine dispute

10   exists as to whether the County maintains a custom or practice of delaying referrals for inmates to

11   receive outside orthopedic care. Accordingly, the court will deny both motions for summary

12   judgment as to plaintiff's *Monell* claim.

13   **D.      Federal IIED Claim**

14       In his third cause of action, plaintiff brings a federal claim for IIED against the deputy

15   defendants. (Doc. No. 40 at 27.) In their motion for summary judgment, defendants contend that

16   the federal IIED claim does not state a cognizable claim for relief. (Doc. No. 69-1 at 23.)

17   Plaintiff has not sought summary judgment on his federal IIED claim.

18       Plaintiff's third claim is not cognizable under § 1983 because an intentional infliction of

19   emotional distress is not a constitutional tort. *See Murillo v. City of Glendale*, No. 15-cv-02297-

20   PHX-GMS, 2018 WL 4953274, at *3 (D. Ariz. Oct. 12, 2018) ("[I]f the claim is characterized

21   instead as an unconstitutional infliction of emotional distress caused by witnessing the attack on

22   [one of the plaintiffs], it likewise fails. That would be a state tort law claim—not cognizable

23   under section 1983."); *see also Shinn ex rel. Shinn v. Coll. Station Indep. Sch. Dist.*, 96 F.3d 783,

24   786 (5th Cir. 1996) ("There is no constitutional right to be free from emotional distress."); *Baker*

25   *v. McCollan*, 443 U.S. 137, 146 (1979) ("Section 1983 imposes liability for violations of rights

26   protected by the Constitution, not for violations of duties of care arising out of tort law."). Thus,

27   the court will grant summary judgment in the deputy defendants' favor as to plaintiff's federal

28   IIED claim.

1    **E.      State Law Claims**

2          1.      <u>California IIED Claim Against the Deputy Defendants</u>

3          In his sixth cause of action, plaintiff asserts a claim for IIED under California law against

4    the deputy defendants.  (Doc. No. 40 at 34.)  In their motion for summary judgment, defendants

5    argue that plaintiff fails to state a cognizable IIED claim.  (Doc. No. 69-1 at 26.)  Plaintiff does

6    not move for summary judgment on his state IIED claim.

7          Under California law, to state a claim for IIED, plaintiff must allege "(1) extreme and

8    outrageous conduct by [defendants] with the intention of causing, or reckless disregard of the

9    probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme

10   emotional distress; and (3) actual and proximate causation of the emotional distress by the

11   defendant's outrageous conduct."  *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (citations

12   omitted).  "A defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds

13   of that usually tolerated in a civilized community' [and] the defendant's conduct must be

14   'intended to inflict injury or engaged in with the realization that injury will result.'"  *Id.* at 1050–

15   51 (quoting *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993)).

16         In their pending motion, defendants merely argue that for the same reasons that plaintiff's

17   deliberate indifference claims against the deputy defendants fail, there is likewise no admissible

18   evidence that any of the individual defendants' conduct rose to the level of extreme and

19   outrageous behavior sufficient to maintain and support an IIED claim.  (Doc. No. 69-1 at 24, 26.)

20   However, a claim for deliberate indifference under § 1983 and a claim for IIED under California

21   common law have different legal elements.  Thus, it is not clear at all how defendants' deliberate

22   indifference arguments are relevant to plaintiff's IIED claim brought under California law, and

23   defendants have offered no explanation or elaboration in this regard.  Accordingly, defendants'

24   motion for summary judgment in their favor as to plaintiff's IIED claim brought under California

25   law will be denied.

26         2.      <u>Negligence Claim Against the Deputy Defendants</u>

27         As noted above, plaintiff asserts as his seventh cause of action a negligence claim against

28   the deputy defendants.  (Doc. No. 40 at 35.)  Defendants move for summary judgment on this

1   claim.  (Doc. No. 69-1 at 26.)  Plaintiff does not so move.

2          To state a claim for negligence under California law, a plaintiff must sufficiently allege

3   "(a) a *legal duty* to use due care; (b) a *breach* of such legal duty; [and] (c) the breach [was] the

4   *proximate or legal cause* of the resulting injury."  *Ladd v. Cnty. of San Mateo*, 12 Cal. 4th 913,

5   917 (1996) (citation omitted).

6                          a.      *Defendant Dominguez*

7          Defendants argue that defendant Dominguez is entitled to summary judgment as to

8   plaintiff's negligence claim because plaintiff has admitted that he never discussed his medical

9   condition with defendant Dominguez.  (Doc. No. 69-1 at 26.)  However, plaintiff contends that he

10  believes defendant Dominguez knew about plaintiff's immediate medical care needs because of

11  plaintiff's use of crutches in his presence.  Taking the evidence on summary judgment in the light

12  most favorable to plaintiff, defendant Dominguez's observance of plaintiff using crutches is

13  circumstantial evidence that defendant Dominguez was aware of plaintiff's need for crutches.

14  *See Jackson v. Zadeh*, No. 2:18-cv-01132-MCE-CKD, 2020 WL 508906, at *4 (E.D. Cal. Jan. 31,

15  2020) ("Indeed, permitting an inmate to possess crutches is not trivial considering the manner in

16  which crutches could be used as a weapon; the fact that the defendant allowed plaintiff to use

17  crutches is circumstantial evidence that the defendant was aware of plaintiff's limitations with his

18  knee."), *report and recommendation adopted*, No. 2:18-cv-01132-MCE-CKD, 2020 WL 1536105

19  (E.D. Cal. Mar. 31, 2020), *aff'd sub nom. Jackson v. Soltanian-Zadeh*, 834 F. App'x 421 (9th Cir.

20  2021).

21         Additionally, defendants argue that the negligence claim based on plaintiff's alleged chest

22  pains is unsupported because the medical record indicates that plaintiff was medically examined

23  for cardiac issues on September 6, 2016, the same day he encountered defendant Dominguez.

24  (Doc. No. 69-1 at 26.)  However, a dispute exists in the evidence regarding the timing of

25  plaintiff's medical examination on September 6, 2016, and whether it occurred in the morning

26  (defendants' version) or later in the afternoon due to defendant Dominguez allegedly interfering

27  with plaintiff receiving care (plaintiff's version).

28  /////

1  For these reasons, the court will deny defendants' motion for summary judgment as to

2  plaintiff's negligence claim against defendant Dominguez.

3          b.    *Defendant Yang*

4  In moving for summary judgment in defendant Yang's favor on plaintiff's negligence

5  claim, defendants assert two key points.  First, they argue that defendant Yang lacked awareness

6  of plaintiff's medical condition.  (Doc. No. 69-1 at 26.)  Second, they argue that defendant Yang

7  cannot be held liable for negligence regarding the denial of a lower tier and lower bunk

8  assignment because no physician had written a medical order when defendant Yang denied

9  plaintiff's assignment request on February 6, 2017, and the order was not created until February

10  8, 2017, following plaintiff's fall down the stairs.  (*Id.* at 26–27.)  However, plaintiff has come

11  forward with evidence that he had provided defendant Yang with a chrono on February 6, 2017,

12  specifying his need for a lower tier, lower bunk, and additional blankets.  Consequently, the court

13  finds that plaintiff has met his burden in opposing defendants' motion for summary judgment by

14  presenting evidence which, if true, would create a genuine dispute whether defendant Yang was

15  aware of plaintiff's medical needs and acted negligently by denying him a lower tier assignment

16  and blankets.  Accordingly, the court will deny defendants' motion for summary judgment on

17  plaintiff's negligence claim against defendant Yang.

18          c.    *Defendant Meier*

19  In moving for summary judgment in defendant Meier's favor on plaintiff's negligence

20  claim, defendants argue that, although plaintiff requested a wheelchair from defendant Meier after

21  his medical appointment with Dr. Henderson, defendant Meier lacked the authority to provide a

22  wheelchair because Dr. Henderson had already denied plaintiff's request for one.  (*Id.* at 27.)

23  Plaintiff acknowledges that such medical decisions fall under the purview and authority of

24  medical staff, not deputies.  Plaintiff has therefore not shown that defendant Meier's conduct in

25  denying him a wheelchair constitutes negligence.  Accordingly, the court will grant defendants'

26  motion for summary judgment in favor of defendant Meier on plaintiff's negligence claim

27  brought against him to the extent that claim is predicated on defendant Meier's denying plaintiff a

28  wheelchair.

1          d.      *Defendant Grout*

2          Defendants next argue that defendant Grout is entitled to summary judgment on plaintiff's

3   negligence claim.  (Doc. No. 69-1 at 27.)  Defendants contend that plaintiff's claim fails because

4   "plaintiff was transferred within 45 minutes to a lower tier lower bunk following the appointment

5   with the doctor and conversation with Deputy Grout."  (Doc. No. 69-1 at 9.)  While not explicitly

6   stated, defendants' argument suggests that, because plaintiff received his desired bunk assignment

7   after only a forty-five-minute delay, plaintiff has not provided any evidence that any injury

8   resulted from defendant Grout's conduct in initially denying plaintiff that bunk assignment.  In

9   other words, plaintiff has not shown that any injury was caused by defendant Grout's conduct—

10  an essential element for a negligence claim.  This argument is persuasive.  Accordingly, the court

11  will grant defendants' motion for summary judgment in favor of defendant Grout as to plaintiff's

12  negligence claim brought against him to the extent that claim is predicated on defendant Grout's

13  initial denial of plaintiff's bunk reassignment request.

14          3.      Bane Act Claim Against the Deputy Defendants

15          As noted above, in his TAC, plaintiff asserts as his eighth cause of action a Bane Act

16  claim against the deputy defendants.  (Doc. No. 40 at 36.)  Defendants move for summary

17  judgment in their favor on this claim.  (Doc. No. 69-1 at 27.)  Plaintiff does not so move.

18          The Bane Act, codified at California Civil Code § 52.1, "protects individuals from

19  conduct aimed at interfering with rights that are secured by federal or state law, where the

20  interference is carried out 'by threats, intimidation or coercion.'"  *Reese v. Cnty. of Sacramento*,

21  888 F.3d 1030, 1040 (9th Cir. 2018) (quoting *Venegas v. Cnty. of Los Angeles*, 153 Cal. App. 4th

22  1230 (2007)); *see* Cal. Civ. Code § 52.1(b).  Section 52.1 does not require that "the offending

23  'threat, intimidation or coercion' be 'independent' from the constitutional violation alleged."

24  *Reese*, 888 F.3d at 1043 (quoting *Cornell v. City of San Francisco*, 17 Cal. App. 5th 766, 800

25  (2017)).

26          As for defendants Dominguez and Yang, because the court has found that there is a

27  genuine dispute of material fact regarding whether they were deliberately indifferent to plaintiff's

28  medical needs and plaintiff has produced evidence in support of his deliberate indifference claims

35

against them, he may proceed to trial on his Bane Act claim against them as well.  *See Li v. City of Santa Ana*, No. 8:20-cv-00068-SB-JDE, 2021 WL 3207957, at *8 (C.D. Cal. May 25, 2021) ("Because Plaintiffs have produced enough evidence to proceed on a theory of deliberate indifference, they also may proceed to trial on their Bane Act claim.") (citing *Luttrell v. Hart*, No. 5:19-cv-07300-EJD, 2020 WL 5642613, at *5 (N.D. Cal. Sept. 22, 2020) ("[I]f a plaintiff adequately pleads a claim for deliberate indifference, which requires a pleading of reckless disregard, then he has sufficiently alleged the intent required for the Bane Act claim.")); *Shidler v. Cnty. of San Bernardino*, No. 5:19-cv-00503-AB-SHK, 2022 WL 2255005, at *12–*13 (C.D. Cal. Mar. 7, 2022) (holding that certain defendants were not entitled to summary judgment on the plaintiff's Bane Act claim against them because the court had already found that there were genuine issues of material fact as to whether those defendants were deliberately indifferent to the decedent's medical needs).  Accordingly, the court will deny summary judgment with respect to plaintiff's Bane Act claim as to defendants Dominguez and Yang.

As for defendants Meier and Grout, the court has already concluded that they are entitled to summary judgment in their favor on plaintiff's deliberate indifference claims to the extent those claims are predicated on defendant Meier's denying plaintiff a wheelchair and defendant Grout's initial denial of plaintiff's bunk reassignment request because plaintiff has not come forward with any evidence that defendants Meier and Grout committed a constitutional violation. Thus, defendants Meier and Grout are likewise entitled to summary judgment in their favor as to plaintiff's Bane Act claim based on those same factual predicates.  *See Williamson v. City of Nat'l City*, 23 F.4th 1146, 1155 (9th Cir. 2022) (reversing a district court's denial of summary judgment to defendants on the plaintiff's Bane Act claim because there was no proof of an underlying constitutional violation); *Barela v. Cnty. of Orange*, No. 8:21-cv-00799-JVS-DFM, 2022 WL 17037430, at *9 (C.D. Cal. Aug. 4, 2022) ("[W]here there is no proof of an underlying constitutional violation, defendants are entitled to summary judgment on a corresponding Bane Act claim.").

/////

/////

36

1          4.     Medical Malpractice

2          As described above, as the eleventh cause of action in the TAC, plaintiff asserts a claim

3 for medical malpractice against defendants Dr. Nugent and Nurse Gallagher.  (Doc. No. 40 at 40.)

4 Only defendants have moved for summary judgment on this claim.  (Doc. No. 69-1 at 29.)

5          Under California law, the elements for professional negligence, including medical

6 malpractice, that a plaintiff must prove are:  "(1) the duty of the professional to use such skill,

7 prudence, and diligence as other members of his profession commonly possess and exercise; (2)

8 breach of that duty; (3) a proximate causal connection between the negligent conduct and the

9 resulting injury; and (4) actual loss or damage resulting from the professional's negligence."

10 *Hanson v. Grode*, 76 Cal. App. 4th 601, 606 (1999) (citation omitted).

11         Defendants advance several arguments in moving for summary judgment on this claim.

12 First, they argue that defendant Nurse Gallagher cannot be liable for medical malpractice because

13 she was acting in an administrative capacity, rather than in her a role as a nurse, and she had no

14 knowledge about heel fractures.  (Doc. No. 69-1 at 30.)

15         It is true that "under California law, a medical malpractice claim can only be brought

16 against a medical professional."  *Johnson v. Lucent Techs., Inc.*, No. 08-cv-06002-CAS-CT, 2009

17 WL 10671937, at *7 (C.D. Cal. Jan. 26, 2009) (citing *Avivi v. Centro Medico Urgente Med. Ctr.*,

18 159 Cal. App. 4th 463, 468 n.2 (2008) (noting the elements of a medical malpractice claim), *rev'd*

19 *in part on other grounds by* 653 F.3d 1000 (9th Cir. 2011)).  However, here, defendant Nurse

20 Gallagher is a registered nurse.  Defendants do not cite any legal authority, nor has the court

21 found any, establishing that a medical professional cannot be held liable for medical malpractice

22 if an injury results primarily from the professional's allegedly negligent performance of

23 administrative duties in the course of providing professional medical services.

24         Next, defendants argue that defendant Dr. Nugent cannot be held liable for medical

25 malpractice because, by the time he reviewed plaintiff's chart on October 2, 2016 and made

26 recommendations, plaintiff was already scheduled for his October 11, 2016 appointment with Dr.

27 Casey, an outside orthopedic surgeon, at San Joaquin General Hospital.  (Doc. No. 69-1 at 30.)

28 However, a reasonable jury could determine from the evidence before the court on summary

judgment that it was medically unacceptable for defendant Nugent to defer to the scheduled

appointment date because he should have known that there was only a limited period available

within which the ORIF surgery could be performed. *See King v. Naphcare, Inc.*, No. 1:20-cv-

00943-CDB, 2023 WL 2957708, at *11 (E.D. Cal. Apr. 14, 2023) (holding that "a reasonable jury

may conclude that it was medically unacceptable for [the defendant nurse and doctor] to defer to

the CRMC's Oral Surgery Clinic's appointment date when they knew that [the plaintiff] had an

urgent condition").

For these reasons, the court will deny defendants' motion for summary judgment in their

favor as to plaintiff's medical malpractice claim.

### 5.   Failure to Furnish/Summon Medical Care

In his operative TAC, the plaintiff asserts his eighth claim against defendants Dr. Nugent,

Nurse Gallagher, and the deputy defendants, alleging a violation of his right to medical care under

California Government Code § 845.6.  (Doc. No. 40 at 38.)  Defendants move for summary

judgment in their favor on this claim as to all six defendants, and plaintiff cross-moves as to

defendant Nurse Gallagher only.  (Doc. Nos. 69-1 at 28; 71-1 at 23.)  The court will first address

this claim as brought against defendants Dr. Nugent and Nurse Gallagher before turning to the

claim brought against the deputy defendants.

California Government Code § 844.6, titled "Injuries by and to prisoners," establishes that

"a public entity is not liable for . . . an injury proximately caused by any prisoner . . . [or] [a]n

injury to any prisoner."  Cal. Gov't Code § 844.6(a)(1)–(2); *see also Roy v. Cnty. of Los Angeles*,

114 F. Supp. 3d 1030, 1038 (C.D. Cal. 2015) ("[S]ection 844.6 accords broad public entity

immunity . . . .").  The statute's reference to "any prisoner" includes jail detainees.  *See White v.*

*L.A. Cnty. Sheriff's Dep't*, No. 19-cv-04669-DSF-RAO, 2020 WL 5289848, at *10 (C.D. Cal.

July 17, 2020) ("California Government Code § 844.6 generally makes public entities immune

from liability for an injury to 'any prisoner,' which includes jail detainees.") (citing Cal. Gov't

Code § 844.6).  However, the failure to summon medical care, as outlined in § 845.6, is a

statutory exception to this broad immunity.  *See* Cal. Gov't Code § 845.6.  This exception holds

public entities vicariously liable for the action or inaction of public employees who, acting within

the scope of their employment, know or have reason to know that a "prisoner is in need of immediate medical care and . . . fails to take reasonable action to summon such medical care." *Id.* "[T]o state a claim under § 845.6, a prisoner must establish three elements:  (1) the public employee knew or had reason to know of the need (2) for immediate medical care, and (3) failed to reasonably summon such care." *Jett*, 439 F.3d at 1099.

In plaintiff's motion for summary judgment, he points out that in its decision *Jett*, the Ninth Circuit determined that "immediate medical care" encompassed "both diagnosis and treatment."  (Doc. No. 71-1 at 23–24) (quoting *Jett*, 439 F.3d at 1099).  Plaintiff argues that he had been diagnosed with a calcaneal fracture and was referred by Dr. Kungys for surgical treatment, but that no surgical treatment was ever provided, a situation similar to that before the court in *Jett*.  (Doc. No. 71-1 at 23–24.)  However, the California Court of Appeal rejected the interpretation of § 845.6 that the Ninth Circuit had outlined in *Jett*, finding that "the Ninth Circuit's application of section 845.6 [in *Jett*] ignores California authority interpreting that statute."  *See Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1074 (2013).  California courts have held that if a defendant is summoned to provide treatment, the failure to ensure a proper diagnosis, monitor progress, or prescribe necessary medication are all "issues relating to the manner in which medical care is *provided*, and do not subject the State to liability under section 845.6 for failure to *summon*." *Id.* (collecting cases).  The state appellate court in *Castaneda* further stated that "[w]ere we to conclude the duty under section 845.6 includes furnishing, monitoring, followup, or subsequent care for the same condition, as the estate argues *Jett* does, we would be expanding the liability of the public entity beyond that contemplated by the Legislature." *Id.*

Plaintiff's reliance on the Ninth Circuit's decision *Jett* is unavailing because the California Court of Appeal's decision in *Castaneda* controls.  *See Briceno v. Scribner*, 555 F.3d 1069, 1080 (9th Cir. 2009) ("In the absence of a pronouncement by the highest court of a state, the federal courts must follow the decision of the intermediate appellate courts of the state unless there is convincing evidence that the highest court of the state would decide differently.") (citations omitted); *Prescott v. Nestle USA, Inc.*, No. 22-15706, 2023 WL 5346039, at *1 (9th Cir. Aug. 21,

2023); *see also Vivanco v. Cal. Dep't of Corr. & Rehab.*, 817 F. App'x 492, 493 (9th Cir. 2020)[13] (affirming the district court's granting of summary judgment in favor of the defendants on the plaintiff's California Government Code § 845.6 claim, finding that "[the plaintiff's] arguments involve CDCR staff's decisions about [the decedent's] care, not a failure to summon care") (citing *Castaneda*, 212 Cal. App. 4th at 493); *Scalia*, 308 F. Supp. 3d at 1087 (declining to follow *Jett* in light of *Castaneda*); *Mollica*, 2023 WL 3481145, at *12 (same).

As for plaintiff's claim against defendants Nurse Gallagher and Dr. Nugent for failure to summon medical care, these defendants became involved in this case after plaintiff had been placed in a splint, fitted with crutches, and received medical care from other medical staff at the jail. Thus, questions regarding the need for specialized care or the quality of care that plaintiff received are questions regarding the provision of care to plaintiff rather than the failure to summon care. *See Mollica*, 2023 WL 3481145, at *13 ("Questions of whether [he] needed to see an orthopedic doctor, get immediate surgery or received the proper care all involve decisions about plaintiff's care and not the failure to summon care."); *Castaneda*, 212 Cal. App. 4th at 1074 ("Once summoned, the quality of medical care is a matter of medical policy and practice, . . . but it is not a violation of the employee's obligation to summon medical care under section 845.6.").

Turning to the deputy defendants, because there is a factual dispute regarding the timing of defendant Dominquez seeking medical attention for plaintiff's complaints of chest pains, defendants have not established that defendant Dominguez is entitled to summary judgment as to plaintiff's § 845.6 claim to the extent it is based on that incident. However, as to the other deputy defendants, there is no evidence before the court on summary judgment that plaintiff made any request for medical attention to defendants Yang or Grout, and it is undisputed that defendant Meier promptly took plaintiff to see Dr. Henderson following his fall on February 8, 2017.

For these reasons, the court will grant defendants' motion for summary judgment in favor of defendants Dr. Nugent, Nurse Gallagher, Yang, Meier, and Grout on plaintiff's § 845.6 claim, but will deny the motion as to plaintiff's § 845.6 claim against defendant Dominguez. In

---

[13] Citation to these unpublished Ninth Circuit opinions is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1  addition, the court will deny plaintiff's motion for summary judgment in his favor on his § 845.6

2  claim against defendant Nurse Gallagher.

3        6.    <u>State Law Claims Against Defendant County</u>

4      In his remaining two causes of action brought against the County, plaintiff asserts state

5  law claims for:  *respondeat superior* under California Government Code § 815.2(a) and failure to

6  perform a mandatory duty under California Government Code § 815.6 (tenth claim) and failure to

7  provide timely medical care for inmates in violation of California Government Code § 845.6

8  (twelfth claim).  The parties cross moved for summary judgment on these claims.  (Doc. Nos. 69-

9  1 at 29–30; 71-1 at 24.)

10      Based on § 844.6 and § 845.6, the County cannot be held liable for any injury to a pre-

11  trial detainee, unless one of its public employees, while acting in the scope of their employment,

12  knew or had reason to know that the pre-trial detainee was in need of immediate medical care and

13  failed to take reasonable action to summon medical care.  Cal. Gov't. Code §§ 844.6, 845.6; *A.B.*

14  *by & through Brown v. Cnty. of Siskiyou*, No. 2:16-cv-01752-MCE-EFB, 2019 WL 4747707, at

15  *7 (E.D. Cal. Sept. 30, 2019)).  Consequently, in light of the court's analysis set forth above and

16  its denial of defendants' motion for summary judgment in defendant Dominguez's favor on

17  plaintiff's claim that he failed to summon medical care when plaintiff complained of chest pain,

18  the County may only be liable as to these two claims based on defendant Dominguez's conduct,

19  not that of the other defendants.  Because there is a genuine dispute of material fact regarding

20  plaintiff's claim that defendant Dominguez failed to summon medical care, summary judgment

21  cannot be granted in favor of either party on the remaining state law claims against the County.

22      In conclusion, defendants' motion for summary judgment in favor of the County on

23  plaintiff's tenth and twelfth causes of action will be denied, and plaintiff's motion for summary

24  judgment in his own favor on these two claims will likewise be denied.

25                               **CONCLUSION**

26      For the reasons explained above,

27      1.    Defendants' motion for summary judgment (Doc. No. 69) is granted in part and

28              denied in part as follows:

a.     Defendants' motion for summary judgment in their favor as to plaintiff's second claim for deliberate indifference under 42 U.S.C. § 1983 against defendants Dominguez, Meier, Grout is granted to the extent that claim is predicated on defendant Dominguez's alleged jihadist comment; defendant Meier's denying plaintiff a wheelchair, and defendant Grout's initial denial of plaintiff's bunk reassignment;

b.     Defendants' motion for summary judgment in their favor as to plaintiff's third claim for intentional infliction of emotional distress under 42 U.S.C. § 1983 against defendants Dominguez, Yang, Meier, and Grout is granted;

c.     Defendants' motion for summary judgment in their favor as to plaintiff's fourth claim for deliberate indifference under 42 U.S.C. § 1983 against defendant Nurse Gallagher based on supervisor liability is granted;

d.     Defendants' motion for summary judgment in their favor as to plaintiff's seventh claim for negligence against defendants Meier and Grout is granted to the extent that claim is predicated on defendant Meier's denying plaintiff a wheelchair and defendant Grout's initial denial of plaintiff's bunk reassignment;

e.     Defendants' motion for summary judgment in their favor as to plaintiff's eighth claim under the Bane Act against defendants Meier and Grout is granted to the extent that claim is predicated on defendant Meier's denying plaintiff a wheelchair and defendant Grout's initial denial of plaintiff's bunk reassignment;

f.     Defendants' motion for summary judgment in their favor as to plaintiff's ninth claim for violation of California Government Code § 845.6 against defendants Nugent, Gallagher, Yang, Meier, and Grout is granted; and

g.     Defendants' motion is otherwise denied;

2.     Plaintiff's motion for partial summary judgment (Doc. No. 71) is denied; and

/////

42

1      3.    Consistent with the pretrial scheduling order issued by the previously assigned

2    district judge that still governs in this case, the "parties are ordered to file a Joint

3    Notice of Trial Readiness not later than thirty (30) days" after the date of entry of

4    this order.  (Doc. No. 37 at 6.)

5    IT IS SO ORDERED.

6    Dated:  __December 14, 2023__

7                                  DALE A. DROZD
UNITED STATES DISTRICT JUDGE